UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| NEALAN BHATT, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 8:17-cv-02185-CEH-AEP |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | <u>**DEMAND FOR JURY TRIAL**</u> |
| TECH DATA CORPORATION, ROBERT M. DUTKOWSKY and CHARLES V. DANNEWITZ, | ) ) ) ) | |
| Defendants. | ) ) | |
| | ) | |

**LEAD PLAINTIFF WAYNE COUNTY EMPLOYEES' RETIREMENT
SYSTEM'S AMENDED CLASS ACTION COMPLAINT FOR
<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE ..........................................................5

III.    PARTIES .............................................................................................6

IV.     SUBSTANTIVE ALLEGATIONS ......................................................9

        A.      Background on Tech Data's Business ......................................9

        B.      Tech Data Acquires the Technology Solutions Business from
                Rival Distributor Avnet.........................................................11

        C.      After the Technology Solutions Acquisition Closes, Tech Data
                Reports Fourth Quarter and Fiscal Year 2017 Results But
                Declines to Give Guidance for First Quarter 2018 ..................13

        D.      Following the Close of the Acquisition, Tech Data Continues
                Its Integration of Technology Solutions ..................................15

        E.      Tech Data Reports First Quarter 2018 Results and Provides
                Second Quarter 2018 Guidance While Concealing Execution
                Issues in the Technology Solutions Business and the Impact of
                an Increasingly Competitive European Market .........................16

        F.      Defendants Shock Investors by Reporting Second Quarter 2018
                Earnings Per Share Substantially Below Prior Guidance .........22

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS DURING THE CLASS PERIOD...................................24

VI.     THE TRUTH EMERGES...................................................................31

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER................................35

VIII.   LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC
        LOSS...............................................................................................39

IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
        FRAUD ON THE MARKET DOCTRINE .........................................42

X.      NO SAFE HARBOR ............................................................................43

XI.     CLASS ACTION ALLEGATIONS .....................................................45

By and through the undersigned counsel, Lead Plaintiff Wayne County Employees' Retirement System ("Plaintiff") alleges the following against Tech Data Corporation ("Tech Data" or the "Company"), Robert M. Dutkowsky ("Dutkowsky"), and Charles V. Dannewitz ("Dannewitz") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Tech Data with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; and (e) information readily obtainable on the Internet.  Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the common stock of Tech Data between June 1, 2017 and August 31, 2017, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), against Tech Data and certain of its senior executives for violations of the federal securities laws.

2.      Tech Data is a wholesale distributor of technology products, bringing products from approximately 1,000 of the world's leading technology vendors to market and providing its

customers with logistics support and services. Among the products in Tech Data's linecard are networking equipment, software and technology peripherals, data center and storage technology, consumer electronics, digital displays, and mobile phone hardware and accessories. Tech Data sells these products to value-added resellers, small and medium-sized businesses, and direct marketers and retailers in North America, Europe, and Asia.

3.     On February 27, 2017, Tech Data announced that it had completed its acquisition of Technology Solutions, another technology distribution business originally owned by Tech Data rival Avnet, Inc. ("Avnet"). Unlike Tech Data, which until that point had generated most of its sales from its low-margin "broadline" operations (*e.g.*, notebooks, desktops, printers, and computer components), Technology Solutions focused on value-added distribution and higher-margin data center products. Tech Data touted the benefits the acquisition was anticipated to provide, including enhanced "end-to-end" distribution capabilities, expanded vendor relationships, and access to additional markets and cross-selling opportunities.

4.     Following the close of the Technology Solutions acquisition, on March 8, 2017, Tech Data reported financial results for its fourth quarter and fiscal year ended January 31, 2017 ("4Q17/FY17"). In announcing the Company's results, however, Defendants declined to give guidance for the first quarter of fiscal 2018 ("1Q18") in light of the fact that the Technology Solutions acquisition had closed just ten days prior. Instead, Defendants reassured investors that the Company would be prepared to provide guidance when it reported its 1Q18 results, after Defendants had gained the requisite visibility into and understanding of Technology Solutions' financials and operations in order to do so accurately.

5.     As promised, on June 1, 2017, more than three months after the close of the Technology Solutions acquisition, Tech Data announced its 1Q18 results and provided guidance for the second quarter of fiscal 2018 ("2Q18").  In the Company's press release and during the earnings conference call later that day, Defendants emphasized the Company's strong execution capabilities, noting that the combined Tech Data-Technology Solutions was "executing extremely well."  Whether Tech Data could, in fact, execute "extremely well" was material to investors, as problems with execution had the potential to directly impact the Company's key financial metrics, including sales, gross profit margins, and earnings.  Defendants also highlighted the Company's "optimization" of its vendor relationships and noted that the integration of Technology Solutions was progressing even more successfully than had been anticipated.  Defendants completed the rosy picture of Tech Data's prospects by providing second quarter guidance of non-GAAP earnings per share ("EPS") in the range of $1.95 to $2.08.

6.     Unfortunately for investors, the statements Defendants made in the June 1, 2017 press release and earnings conference call, along with statements subsequently made on June 8, 2017 in the Company's 1Q18 Form 10-Q for the period ended April 30, 2017 filed with the SEC ("1Q18 10-Q") and at an analyst conference, were materially false and misleading and omitted material facts.  Despite Defendants' glowing representations regarding the combined Tech Data-Technology Solutions' execution capabilities, Defendants knew, or disregarded with severe recklessness, that the Company was experiencing significant execution problems that were negatively impacting profit margins and Tech Data's ability to achieve forecasted earnings.

7. First, the Company's European components business, already a low-margin industry by nature, was suffering as a result of the Technology Solutions integration. Legacy Technology Solutions had operated under a different distribution model in Europe than was used by Tech Data, meaning that it did not buy, price, or sell components in the same way as legacy Tech Data, and, crucially, did not hedge for currency exchange fluctuations. This, combined with a persistently strengthening Euro, was causing significant downward pressure on Tech Data's margins.

8. Second, Tech Data was also experiencing undisclosed difficulties managing certain large vendor relationships inherited from Technology Solutions. The Company was struggling to negotiate sales targets with vendors that, if achieved, would result in substantial and critical back-end rebates to Tech Data at the end of the quarter, thereby greatly enhancing Tech Data's profit margins. Not only did Defendants fail to disclose Tech Data's problems negotiating achievable quarterly targets with these vendors, they also failed to disclose how highly dependent Tech Data's margins were on achieving those rebates, and that they would not know whether the rebates and, consequently, the Company's projected earnings, could be attained until the very end of each quarter.

9. Finally, the European broadline market, a primary generator of Tech Data's sales, had experienced abnormal competitive pressure in 1Q18, and showed no sign of easing as fiscal 2018 continued. As a result of the increased competition and flat end-user demand, distributors in Europe, like Tech Data competitor Ingram Micro, were engaging in pricing wars that placed downward pressure on Tech Data's already-low broadline profit margins. The highly

competitive European market was known to Defendants or recklessly disregarded by them, yet the Company failed to account for the abnormally competitive environment in its 2Q18 forecast.

10.     As a result of Defendants' materially false and misleading statements and omissions, Tech Data shares traded at artificially inflated prices during the Class Period, reaching a high of $110.29 on August 31, 2017.  Seeking to capitalize on the artificially inflated price of Tech Data's common stock, Dutkowsky sold 20,000 shares of Tech Data stock during the Class Period for proceeds of over $2,000,000 – his first open-market stock sales in more than a year.

11.     After the market closed on August 31, 2017, Tech Data shocked investors by announcing that its second quarter non-GAAP EPS had fallen far short of the guidance provided in June, coming in at only $1.74.  Defendants attributed the miss to lower-than-expected gross margins due to: (a) lower sales of high-margin products and missed vendor rebates; (b) an increasingly competitive market in Europe; and (c) execution issues that impacted the Company's European sales and margins.

12.     When the markets opened on September 1, 2017, Tech Data's stock price dropped $22.83, or approximately *21%*, falling from a close of $110.29 per share on August 31, 2017, to a close of $87.46 per share on September 1, 2017 on a trading volume of over 4 million shares – more than 1 million shares greater than were traded on any day in the previous 11 months.

## II.     JURISDICTION AND VENUE

13.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 CFR §240.10b-5.

14.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

15.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b)-(d), as the acts and conduct complained of herein occurred in substantial part in this District.

16.     In connection with the acts and conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the NASDAQ Global Market ("NASDAQ"), a national securities exchange.

III.    **PARTIES**

17.     Lead Plaintiff Wayne County Employees' Retirement System, as set forth in the certification previously filed with the Court (ECF Nos. 17-2, 17-3) and incorporated herein by reference, purchased shares of Tech Data common stock at an artificially inflated price during the Class Period and was damaged as a result of Defendants' alleged misconduct.

18.     Defendant Tech Data Corporation is a wholesale distributor of technology products with its principal executive offices at 5350 Tech Data Drive, Clearwater, Florida 33760. The Company identifies itself as a link in the technology supply chain by bringing products from technology vendors to market and providing its customers with logistics support and services. Tech Data stock is listed and trades on the NASDAQ, an efficient market, under the ticker symbol "TECD."  As of May 31, 2017, there were over 38 million shares of Tech Data common stock, held by thousands of record holders.

19.     Defendant Robert M. Dutkowsky has served as Tech Data's Chief Executive Officer ("CEO") and a member of the Company's Board of Directors ("Board") since October 2006.  In June 2017, Dutkowsky also became Chairman of the Company's Board.  Dutkowsky has approximately 40 years of experience in the IT distribution business, spending the first 20 years of his career at IBM, including in several senior management positions.  Dutkowsky was employed with EMC Corporation ("EMC"), first as Executive Vice President, Markets and Channels and then as President, Data General from 1997 to 2000.  At that point, he became the President, CEO, and Chairman of the Board of GenRad, Inc., where he remained until 2002. From 2002 to 2004, Dutkowsky served as President, CEO, and Chairman of the Board of J.D. Edwards & Co., Inc., a software company.  Immediately prior to joining Tech Data, Dutkowsky served as President, CEO, and Chairman of the Board of Egenera, Inc., a software and virtualization technology company, from 2004 to 2006.  Dutkowsky received a Bachelor of Science in Industrial and Labor Relations from Cornell University.  As CEO of Tech Data, Dutkowsky spoke on Tech Data's behalf in press releases, conference calls, and SEC filings.

20.     Defendant Charles V. Dannewitz is Tech Data's current Chief Financial Officer ("CFO") and Executive Vice President, a role he has held since June 2015.  Dannewitz first joined Tech Data in 1995, and has served in a number of leadership positions since, including as Senior Vice President and CFO of the Americas and as Senior Vice President of Taxes.  Prior to joining Tech Data, Dannewitz was employed by Pricewaterhouse from 1981 to 1995, ultimately becoming a tax partner. Dannewitz received a Bachelor of Science in Accounting from Illinois Wesleyan University and is a Certified Public Accountant.  As Tech Data's CFO, Dannewitz spoke on Tech Data's behalf in press releases, conference calls, and SEC filings.

21. Defendants Dutkowsky and Dannewitz are collectively referred to herein as the "Individual Defendants."

22. During the Class Period, the Individual Defendants, as senior executive officers of Tech Data, were in possession of confidential and proprietary information concerning the Company, its operations, business prospects, and overall financial condition.  By reason of their positions within the Company, the Individual Defendants also had access to material, adverse, nonpublic information concerning Tech Data via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board meetings, and via the reports, presentations, and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or disregarded with severe recklessness that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

23. The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors of the Company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly control the conduct of Tech Data's business.

24. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tech Data's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional

investors, and, through them, to the investing public.  The Individual Defendants had the ability and opportunity to prevent the issuance of the false and/or misleading statements and omissions described herein or cause them to be corrected.  Because of their positions within the Company, and their access to material, non-public information, the Individual Defendants knew, or disregarded with severe recklessness, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then false and misleading.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false statements pleaded herein.

25.     As senior executive officers of Tech Data, and as controlling persons of a publicly traded company whose stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding Tech Data's operations, business, financial metrics, and financial statements, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Tech Data stock would be based upon truthful and accurate information. Defendants' materially false and misleading misstatements and omissions during the Class Period violated these requirements and obligations.

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **Background on Tech Data's Business**

26.     Founded more than 40 years ago, Tech Data is one of the world's largest wholesale distributors of technology products.  According to the Company, it serves as a link in the technology supply chain by bringing products from technology vendors, such as Apple Inc.,

HP Inc., and Cisco Systems, Inc. to the market. Tech Data also provides its customers with a range of services, including logistics, after-sale technical support and training, marketing support, financial services and strategic management consultancy, and sales training.

27. Tech Data distributes and markets hundreds of thousands of products from approximately 1,000 of the world's leading technology hardware suppliers, networking equipment suppliers, software publishers and other suppliers of technology peripherals, consumer electronics, digital displays, and mobile phone hardware and accessories. Tech Data has 22 logistics centers where each day, tens of millions of dollars of technology products are received from vendors and packed and shipped to the Company's customers. Tech Data's customers include over 100,000 value-added resellers, direct marketers, retailers, and corporate resellers, who in turn sell technology products to end users.[1]

28. During the Class Period, Tech Data's product mix was divided into five strategic focus categories primarily comprised of the following products:

- **Broadline**: notebooks, tablets, desktops, printers, supplies, and components (*e.g.*, drives, memory, processors, motherboards, keyboards, monitors)

- **Data center**: industry standard servers, proprietary servers, networking, and storage

- **Software**: virtualization, cloud, security, desktop applications, operating systems, and utilities software

- **Mobility**: mobile phones and accessories

- **Consumer electronics**: TVs, digital displays, consumer audio-visual devices, and network-attached consumer devices

---

[1] A value-added reseller is a company that buys equipment from a vendor at a discount, adds value (such as application software packaged and sold with underlying system software) and re-markets it.

29.     For FY17, Tech Data's lower-margin broadline category comprised 48% of net sales, data center was 21% of net sales, software was 17% of net sales, mobility was 11% of net sales, and consumer electronics was 3% of net sales.

30.     Prior to February 27, 2017, Tech Data operated in two geographic segments: the Americas and Europe, holding positions as one of the top three largest IT distributors in North America and the largest IT distributor in Europe.  These regions represented approximately 39% and 61% of Tech Data's sales in 2016, respectively.  Following Tech Data's acquisition of Technology Solutions, discussed below, the Company began operating in three geographic segments: the Americas, Europe, and Asia-Pacific.

**B.     Tech Data Acquires the Technology Solutions Business from Rival Distributor Avnet**

31.     Recognizing an industry and market shift toward the so-called next-generation "third platform technologies," including converged and hyper-converged infrastructure, cloud, mobility, information security, and big data, Tech Data sought to expand its distribution business beyond its core low-margin broadline offerings (*e.g.*, PCs, notebooks, and peripherals) to include more high-margin, value-added products and services.  The Company believed a strong presence in the data center in particular was critically important to the future prospects of Tech Data, as the data center serves as the epicenter of the rapidly growing third platform technologies.

32.     Tech Data knew it would not be able to organically grow its data center business at a pace fast enough to keep up with the quickly evolving third platform technologies.  Thus, in 2015, in an effort to further accelerate the Company's growth in the data center business and, by extension, third platform technologies, Tech Data approached Avnet, one of Tech Data's competitors, about purchasing its Technology Solutions business.  Technology Solutions, also a

technology distributor, focused on a higher-margin product portfolio dominated by data center vendors.  Technology Solutions had operations in 35 countries across the Americas, Europe, and Asia, and carried products from approximately 40 significant vendors, including IBM and EMC, which it sold to its 20,000 customers around the world.[2]

33.     On September 19, 2016, after almost a year of negotiations, Tech Data announced that it had entered into an interest purchase agreement with Avnet to acquire the Technology Solutions business.  The aggregate purchase price would be approximately $2.672 billion, comprised of approximately $2.425 billion in cash and 2,785,402 shares of Tech Data's common stock, with the cash consideration subject to certain working capital and other adjustments.  In a press release issued that day, Dutkowsky called the acquisition a "transformative transaction, which creates a premier global IT distributor with the most diverse end-to-end solutions from the data center to the living room."  The press release also discussed the purported benefits of the Technology Solutions acquisition, including: (a) significantly broadening the Company's value-added distribution business; (b) increasing Tech Data's ability to capitalize on next-generation/third platform technologies; and (c) extending Tech Data's reach in both new and existing markets.

34.     Specifically, the Company represented that the Technology Solutions acquisition would increase Tech Data's higher-margin data center offerings from approximately 29% to 45% of the Company's revenue and give Tech Data immediate access to Technology Solutions' data center vendors.  The acquisition would also allow Tech Data to capitalize on next-generation technologies, which represented a more than $450 billion market opportunity that was

---

[2]     In September 2016, Dell Technologies acquired EMC and the combined company became Dell EMC.

expected to grow at a 13% compounded annual growth rate through 2019.  With the acquisition, Tech Data would also enhance its customer and product portfolios in the Americas and Europe, including expanding the Company's footprint into Latin America for the first time in several years and into the Asia-Pacific region for the first time ever.  According to the Company, the Technology Solutions acquisition would also result in approximately $100 million of cost savings synergies within the first two years after closing.

> **C.      After the Technology Solutions Acquisition Closes, Tech Data Reports Fourth Quarter and Fiscal Year 2017 Results But Declines to Give Guidance for First Quarter 2018**

35.      On February 27, 2017, Tech Data announced it had completed its acquisition of Technology Solutions.  In a Company press release issued that day, Tech Data extolled the acquisition of Technology Solutions as "significantly broaden[ing] Tech Data's value-added distribution business, increasing the company's ability to help its partners capitalize on next-generation technologies while enhancing its go-to-market capabilities with complementary skills, expanded vendor relationships, and new customer sets."  In the same press release, the Company also announced Tech Data's new global executive leadership team, disclosing that several former Technology Solutions executives would be joining the Tech Data team, including Patrick Zammit ("Zammit"), formerly the Global President of Technology Solutions, who would become President of Tech Data's European region.  Dutkowsky called the closing of the acquisition a "'momentous day in our company's history.'"

36.      On March 8, 2017, Tech Data issued a press release announcing financial results for its 4Q17/FY17.  However, the Company declined to provide financial guidance for 1Q18 at that time, "[d]ue to the short timeframe between the reporting of Tech Data's fourth quarter

results and completion of Tech Data's acquisition of Avnet's Technology Solutions," instead reassuring investors that the Company would "provide financial guidance for the combined company with its first-quarter fiscal year 2018 results."

37.   During the Company's 4Q17/FY17 earnings conference call held that same day, Dannewitz confirmed that the Company would not be providing financial guidance for 1Q18 given that the Technology Solutions acquisition had just closed the week prior.  Dannewitz explained that "[u]ntil the closing last week on February 27, we had very limited visibility to Technology Solutions' detailed operating results and their financial forecasts."  Notwithstanding the lack of 1Q18 financial guidance, Dannewitz told investors, "[w]e want to be clear that we are confident in the Technology Solutions business in both the financial and strategic benefits of the transaction."

38.   Dutkowsky emphasized that Tech Data was "focused on integrating the two companies and achieving the strategic and financial benefits of the acquisition with minimal disruption" while "leverag[ing] each other's strengths, learn[ing] from each other, and apply[ing] the best of both companies."  When asked to "talk about how the Avnet Technology Solutions business performed most recently," Dannewitz responded that it was "way too early" for the Company to give analysts and investors visibility going forward.  Dutkowsky echoed his sentiments, telling analysts that the Company was not ready to provide 1Q18 guidance.  But Dannewitz assured analysts and investors that Tech Data would give "a full highlight on Q2 earnings power when we release our Q1 earnings."

39.   That Defendants would not give guidance until Tech Data announced its 1Q18 results gave investors the impression that the Company would provide guidance only if and

when Defendants had gained the requisite visibility into and understanding of Technology Solutions' financials and operations to do so accurately.  Thus, heading into the Company's reporting of its first quarter results, analysts were greatly anticipating Tech Data's forecast for 2Q18.

> **D.      Following the Close of the Acquisition, Tech Data Continues Its Integration of Technology Solutions**

40.      The acquisition of Technology Solutions, which Dutkowsky referred to as "the largest and most transformative acquisition in our company's history," not only had resulted in months of pre-closing due diligence, in which the Individual Defendants were personally involved, but extensive post-closing analysis by Company employees as Technology Solutions was integrated into Tech Data.  Prior to the closing of the acquisition, Tech Data established an "integration management office," consisting of "key functional leaders" from both Tech Data and Technology Solutions teams "across the regions," who were tasked with "putting plans in place" to ensure that the integration went smoothly for the Company's customers, vendors, and employees.

41.      As explained by Dutkowsky, once the acquisition closed, the Company had dedicated "integration teams [that] ha[d] been fully engaged across the company and ha[d] been working diligently" to bring the companies' operations together.  This included "operational teams" "dedicated to driving the business and preserving the long-standing relationships" the legacy entities had with customers and vendors, as well as "integration teams" "focused on leveraging the strengths of both organizations and applying the best of both companies."

42.      As Tech Data worked to integrate Technology Solutions, Defendants had regular access to detailed insider knowledge regarding legacy Technology Solutions operations and

vendor relationships because they retained several key Technology Solutions employees, such as former Global President of Technology Solutions, Zammit, in new roles after the acquisition closed.  Indeed, Tech Data Chief Operating Officer ("COO") Richard Hume, who reported to Dutkowsky, acknowledged working closely with Zammit on the integration, noting that he had "had the privilege to actually go through the due diligence and the negotiation and the closure of the deal.  [Zammit] was on the other side when we had come through that, and I just have to tell you that he's a superior athlete within the domain of the IT market."  Hume also noted that since the closing, he had engaged with Zammit "on a daily basis."

   E.   **Tech Data Reports First Quarter 2018 Results and Provides Second Quarter 2018 Guidance While Concealing Execution Issues in the Technology Solutions Business and the Impact of an Increasingly Competitive European Market**

   43.   On June 1, 2017, three full months after the Technology Solutions acquisition had closed, Tech Data reported its results for 1Q18.  As previously promised, the Company also provided guidance for 2Q18, announcing that Tech Data anticipated worldwide net sales to be in the range of $8.55 billion to $8.80 billion and non-GAAP EPS in the range of $1.95 to $2.08.  In the Company's press release, during an earnings conference call held that day, in the Company's Form 10-Q for 1Q18 filed on June 8, 2017, and at an analyst conference also held that day, Defendants made materially false and misleading statements and/or omitted material facts concerning: (a) the combined Tech Data-Technology Solutions' execution capabilities; (b) the Company's optimization of relationships with legacy Technology Solutions' vendors; (c) the exceedingly competitive market environment in Europe; and (d) the Company's expected earnings for 2Q18.

44.     During the Class Period, Defendants told investors that the combined Technology Solutions-Tech Data company was "executing extremely well," a fact that was material to investors.  Indeed, Defendants acknowledged as much, referring to Tech Data's ability to "execute" variously as a "core competency," the "bedrock" of the Company's business model, and "fundamental to [its] business success."

45.     As a wholesale distributor of a variety of technology products, Tech Data's ability to "execute" is critical to the Company's financial performance, including its ability to increase gross profit and operating margins, key financial metrics that the Company, analysts, and investors closely track.[3]  For example, Tech Data's broadline business is characterized as a low-margin, high-volume business.  But poor execution in the broadline business, such as committing to sell too many low-margin products at aggressive prices, can negatively impact the Company's overall profit margin.  Conversely, Tech Data's data center business is characterized as a high-margin business, but with a lower volume of sales.  Poor execution in the data center business that causes the Company to miss out on even a few of those margin-rich sales can also negatively impact the Company's overall profit margins.  Thus, in order to maximize gross profit margins, Tech Data must find the right mix of fast-moving, low-margin products and slower-moving, higher-margin ones, while matching inventory levels with the demands of customers and vendors.  Given the importance of "execution" to Tech Data's profitability, it is unsurprising that Tech Data routinely touted its ability to "execute" to investors.  After the Technology Solutions

---

[3]     Gross margin is the difference between the price Tech Data pays vendors for its products and the price it receives from its customers in the sale of those products.  Gross margin tells analysts and investors how good a company is at creating a product or providing a service as compared to its competitors.  Operating margin is a measurement of what proportion of a company's revenue is left over after paying for variable costs of production such as wages and raw materials.

acquisition closed, however, the Company experienced undisclosed execution issues in the Technology Solutions business.

46.     First, the Company was experiencing execution issues in the legacy Technology Solutions' components business (*e.g.*, disk drives, processors, memory, and motherboards). Both Tech Data and Technology Solutions had components businesses spread across multiple countries in the European region, which together generated approximately $1 billion in annual sales.  As Defendants would later reveal, legacy Technology Solutions had policies and practices in place related to its components operations incompatible with those at Tech Data.  Specifically, Technology Solutions bought, sold, and priced components differently than did Tech Data, and, critically, did not hedge for foreign currency exchange fluctuations, while Tech Data did.

47.     Because Tech Data generates a significant amount of sales outside the U.S. – approximately 64% of its sales were generated in countries outside of the U.S. in FY17 – the Company was exposed to fluctuations in foreign currency exchange rates.  The Euro, in particular, represents Tech Data's largest foreign currency exposure, with an estimated 30%-35% of Tech Data's business conducted in the Euro.  As the Euro steadily strengthened against the U.S. dollar beginning in January 2017 and accelerating into the spring and summer of 2017, Tech Data was saddled with higher-priced Technology Solutions components inventory due to legacy Technology Solutions' lack of foreign exchange hedging.  This caused the Company to suffer margin issues in its already low-margin components business.

48.     Second, Tech Data was experiencing undisclosed difficulties in managing several legacy Technology Solutions data center vendors.  As a result of the Technology Solutions acquisition, Tech Data significantly increased its high-margin data center business, with the

Company's data center revenues increasing from approximately 29% of the Company's revenue mix pre-acquisition to approximately 45% post-acquisition.  Because Tech Data's data center business was now a significantly higher percentage of Tech Data's overall revenue (nearly one-half), the Company's profit margins were more susceptible to the data center business, which was higher-margin but also more volatile than Tech Data's traditional broadline business.  Unlike the low-margin, high-volume broadline segment, in the data center business, missed sales from just a few, large, high-margin vendors could cause substantial gross profit losses.  The addition of Technology Solutions' nearly $10 billion data center business, while vastly expanding the scale of the combined Company's operations, inevitably impacted the way Tech Data operated the business.

49.     With the acquisition of Technology Solutions' data center business, Tech Data also acquired relationships with several of Technology Solutions' key data center vendors.  These included, for example, IBM and Dell EMC, which had comprised approximately 25%-30% and 5%-10% of Technology Solutions' revenue, respectively.  Following the Technology Solutions acquisition, IBM and Dell EMC became a much larger part of Tech Data's business than they had been previously.  Although Defendants told investors that following the acquisition, Tech Data was "optimizing" its vendor relationships to ensure the Company had a "strong coverage model with the right skill sets deployed," in truth, the legacy Technology Solutions data center vendors were not vendors that Tech Data "had a long history of managing at the volume and scale and scope" that the Company had to manage post-acquisition, nor did Tech Data have deep relationships or "deep amount of skills" with those vendors.

50.     Tech Data's inexperience with, and inability to properly manage, the legacy Technology Solutions data center vendors ultimately caused the Company to miss sales targets set by those vendors and the critical back-end rebates it could have earned had it met those goals. In simple terms, back-end rebates are bonuses paid by vendors to distribution partners like Tech Data that have met pre-determined sales targets of the vendor's products in a stipulated time frame.  Rebates are a crucial component of Tech Data's profitability because the rebate money earned from vendors reduces the cost of sales and, consequently, goes directly to the Company's bottom line, significantly boosting reported margins and earnings.  However, even a relatively small sales shortfall could cause the Company to miss out on a vendor's "very large margin-rich rebates."

51.     Tech Data negotiates rebate programs with the Company's primary vendors every quarter.  As part of the negotiation process, Tech Data attempts to secure vendor rebate programs that reflect the true demand in the market, allow vendors to pursue market share gain, and provide Tech Data the opportunity to sell enough product to obtain rebates.  Because Tech Data lacked experience in dealing with the legacy Technology Solutions data center vendors, however, the Company was unable to successfully negotiate achievable rebates programs from certain of those vendors for 2Q18.

52.     Further, unbeknownst to investors, the Company's profit margins and, in turn, EPS, were highly dependent on Tech Data's ability (or inability) to achieve vendor rebates. Defendants, who had "managed this rebate environment now for nearly 40 years," also failed to disclose to investors that, whether or not Tech Data would obtain vendor rebates often came down to the very end of a quarter, prior to which time the Company – as Dannewitz would later

disclose – "[does not] know if we're going to make it or miss" the rebates and, consequently, the Company's earnings projections.

53.     In addition to the foregoing undisclosed execution issues, Tech Data was also experiencing an increasingly competitive European market which, post-acquisition, accounted for approximately 52% of the Company's sales.  In fact, the technology distribution market as a whole, which was always competitive, had been experiencing abnormal competitive pressure in Europe, mainly in retailers and large corporate reseller channels, negatively impacting both sales volumes and gross profits of PC-based and peripheral products.  The competitive pricing pressure was caused, in part, by the extremely aggressive attempt of certain broadline distributors, such as Tech Data competitor Ingram Micro, to gain market share, coupled with the ongoing flat end-user demand being experienced by many retailers.  One of Tech Data's competitors called the European region an "altered competitive environment" and warned that there were no signs of the competitive pressure letting up in the second half of fiscal 2018.

54.     Defendants knew, or disregarded with severe recklessness, that the European region was under increasing competitive pricing pressure, as Tech Data employed sophisticated IT systems that gave the Company a clear view of how deals in that region were transacting. Specifically, the Company uses an SAP platform,[4] which Tech Data built from the ground up to support its broadline business.  As Dutkowsky explained after the Class Period, Tech Data's SAP platform allowed the Company to "see . . . the competitive nature of the business."  The Company's position as an "end-to-end" technology distributor also gave Tech Data additional

---

[4]     SAP is a provider of customer relationship management (CRM) solutions and offers a range of business management software in addition to its CRM products.

insight into the competition in each market and, according to Dutkowsky, provided more visibility into that competition, which the Company can see "very clearly versus some of [Tech Data's] competitors."

55.     The increasingly competitive nature of the European broadline market would have also been revealed to Defendants during the Company's forecasting and guidance process. In building out Tech Data's internal plan and financial guidance, the Company reaches out to all of its regions and takes a "bottoms-up" approach, starting at the country level, rolling the countries up to the regional level and aggregating that data together worldwide. The Company's internal plan and forecasting process also takes into account the performance of Tech Data's key vendors, strategic business partners, and competitors. The Company also "review[ed] every [one] of [its] operations twice a quarter" and conducted "pulse surveys" and "walk-the-floor exercises" with executives and had global, regional, local, and even site-specific communication teams. This thorough, "bottoms-up" approach would have revealed increased competitive pressures that were negatively impacting Tech Data's gross margins. Nevertheless, Defendants failed to account for this competitive pressure in the Company's 2Q18 earnings guidance, as they would later admit.

**F.     Defendants Shock Investors by Reporting Second Quarter 2018 Earnings Per Share Substantially Below Prior Guidance**

56.     On August 31, 2017, after the market closed, Tech Data shocked investors and the market by reporting 2Q18 EPS substantially below the guidance Defendants had given just three months earlier. Although Tech Data's net sales of $8.9 billion came in above guidance, the Company's reported non-GAAP EPS of only $1.74 was materially below the forecasted range of

$1.95 to $2.08.  In a press release issued that day, Dutkowsky admitted that the Company "did not deliver the earnings we expected in the quarter."

57.     During the Company's 2Q18 earnings conference call held that same day, Dutkowsky revealed to investors that gross margin of 5.8% "came in lower than expected, resulting in non-GAAP earnings per share below our plan."  Discussing the material EPS miss and disappointing gross margin, Dutkowsky explained that "sales levels of higher-margin products from certain vendors were lower than expected" causing the Company to miss out on "the back-end rebates associated with these higher-margin vendors."  Dutkowsky also blamed the EPS shortfall on underperformance in the Company's global computing components business and an "increasingly competitive" market environment.

58.     Contrary to Defendants' prior statements that the Company was "executing extremely well," Dutkowsky admitted that the "biggest contributor" to the shortfall in Tech Data's European region was the Company's components business and, more specifically, "execution issues that impacted the way we bought and sold products in that space."  With respect to the rebate issue, Dutkowsky confirmed that "a significant piece of the [EPS] shortfall . . . was generated by back-end [rebate] misses," which he also categorized as an "execution"-related issue, disclosing that the Company was still learning to deal with the "new Tech Data," which came with "deeper relationships with vendors that we don't have deep amount of skills with.  So we're learning to manage the challenges and the complexities, and that's why we can say that[ this] fits into that category of execution."

59.     In reaction to the Company's disclosures, the price of Tech Data stock tumbled over 21% from a closing price of $110.29 on August 31 to $87.46 on September 1, 2017.  The

price of Tech Data stock continued to fall in the days after Tech Data's announcement of its disappointing 2Q18 results and the revelation of the previously undisclosed execution issues and competitive market environment, dropping another $3.98 on September 5, 2017 to close at $83.48.

60.     Prior to Defendants' revelations on August 31, 2017, however, Dutkowsky capitalized on the artificially inflated price of Tech Data stock, selling 20,000 shares of Tech Data stock on June 22, 2017 for proceeds of over $2,000,000.  Dutkowsky's Class Period stock sales were suspiciously timed, as they occurred after Defendants' materially false statements and omissions but prior to the Company's revelations a little over two months later.  Further, Dutkowsky had not sold Tech Data stock in the year preceding his June 22, 2017 stock sales and his last open-market stock sales were in March 2016.

61.     As a result of Defendants' wrongful acts and omissions, and the declines in the price of Tech Data common stock detailed herein, Plaintiff and other members of the Class, as defined herein, have suffered significant losses and damages.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

62.     The Class Period begins on June 1, 2017, when, prior to the market's opening, Tech Data released its 1Q18 financial results and provided earnings guidance for 2Q18.  For the first quarter, Tech Data reported net sales of $7.7 billion.  Worldwide non-GAAP operating income was $123.2 million, while non-GAAP operating margin was 1.61%.  For the quarter, Tech Data achieved non-GAAP diluted EPS of $1.87, while return on invested capital on a non-GAAP basis was 13%.

63.     As Defendants had previously promised, the Company also provided guidance for 2Q18, announcing that Tech Data anticipated worldwide net sales to be in the range of $8.55 billion to $8.80 billion and non-GAAP EPS in the range of $1.95 to $2.08.

64.     In the Company's June 1, 2017 press release, Dutkowsky is quoted as praising the Company's progress in integrating Technology Solutions and emphasizing the execution capabilities of the combined Tech Data-Technology Solutions company, stating that the Company had achieved strong 1Q18 financial results "while at the same time making excellent progress on integrating Technology Solutions – the largest and most transformative acquisition in [the] company's history."  Dutkowsky also emphasized that the "first quarter performance – the first as a combined company – is a testament to the ***outstanding execution capabilities of our operations***."

65.     During Tech Data's 1Q18 earnings conference call held that same day, Defendants repeated the Company's 1Q18 results.  Dutkowsky reiterated that "[a]s our fiscal '17 and Q1's fiscal '18 performance show, ***our company is executing extremely well***.  As a team, we delivered strong results in our first quarter as a combined company, while making solid progress on the integration front."

66.     Dannewitz also extolled the progress of the integration of Technology Solutions, stating that, "[a]s [Dutkowsky] indicated, we are making excellent progress integrating the TS business."  Indeed, Dannewitz informed analysts that the integration of Technology Solutions was actually ***ahead*** of schedule, so that cost savings would be more evenly spread throughout fiscal 2018, rather than more heavily weighted towards the second half of the year.  Dannewitz also reiterated the Company's 2Q18 guidance, telling investors that the Company anticipated

"sales to be in the range of $8.55 billion to $8.8 billion" and "non-GAAP earnings per diluted share to be in the range of $1.95 to $2.08."

67.     During the June 1, 2017 earnings call, Defendants also emphasized how the combined Tech Data-Technology Solutions entity was able to optimize its vendor relationships. Dannewitz asserted that "*[a]s part of our integration process, we are optimizing our vendor and customer relationships to ensure we have a strong coverage model with the right skill sets deployed*." Dutkowsky echoed Dannewitz' remarks, stating that as part of the integration process, "[o]ur operational teams are dedicated to driving the business and preserving the long-standing relationships we have with our customers and vendor partners."

68.     During the question-and-answer portion of the earnings conference call, Stifel, Nicolaus & Co. ("Stifel") analyst Matthew Sheerin asked where Tech Data stood "in terms of market share and retaining or maybe growing that market share" in light of statements by Tech Data's competitors that they were targeting Tech Data in an effort to take business from it. In response, Dutkowsky concealed from investors the execution issues described in ¶¶43-55 and that the broadline market in Europe in particular was under exceedingly intense competitive pressure, which was causing downward pressure on the Company's profit margins. Instead, Dutkowsky told investors that Tech Data was gaining share and that "Tech Data performed very, very well in both the – in the advanced side of the business, the former TS business combined with Tech Data's data center practices, but also in the broadline business. So it was a strong performance in the quarter for Tech Data and one that we would stack up against our competitors proudly."

69.     Later in the call, an analyst asked why Tech Data's operating performance margin guidance for 2Q18 was not higher than margin performance in the just-reported 1Q18, in light of the fact that: (a) Tech Data typically experienced better seasonality and margins in the July quarter; (b) it would have one more month of high-margin Technology Solutions sales in the July quarter than in the prior quarter; and (c) Dannewitz had stated earlier in the call that the integration of Technology Solutions was proceeding ahead of schedule.  Dannewitz responded, saying:

> As we build up our model for Q2, we reach out to all of our regions, we do a bottoms-up, thorough look at it and the results and the guidance that we're giving is a result of that process. So we thoroughly look at the margins and the opportunities that present [us], the mix of our – or the products we're going to be selling. And that's reflective in the guidance we're giving you.

70.     When, at the end of the June 1, 2017 earnings call, one analyst asked if, "in terms of the integration of the Technology Solutions business so far, [there had] been any surprises, either positive or negative" that the Individual Defendants had seen, Dutkowsky painted an extremely rosy picture:

> Any time that you take 2 big enterprises like Tech Data and TS and put them together, you're going to find things that are positive upsides and areas you need to work on.  I would say the most pleasant "surprise", the most pleasant revelation we've had is how culturally complementary our 2 organizations are together.  Both organizations have a long history of caring about the customer.  Both organizations understand how to have a relationship with a strategic vendor.  And so therefore, the kinds of people that both companies hired are very, very similar. So when we try to put those 2 cultures together, they seem to be aligning very nicely.  And the new Tech Data wakes up in the morning thinking about customers and vendors and creating value in the marketplace.  Both organizations have that deep in their DNA and we've seen that already manifest itself in the marketplace.

71.     Analysts reacted positively to the Company's June 1, 2017 earnings guidance and messaging on the earnings call, in some instances even raising revenue and EPS estimates for

2Q18 as a result.  Stifel, for example, increased its 2Q18 revenue estimate from $8.34 billion to

$8.66 billion, and its EPS estimate from $1.89 to $2.03.

72.    On June 8, 2017, Tech Data filed its 1Q18 10-Q.  The 1Q18 10-Q reiterated the

Company's financial results as previously reported on June 1, 2017 and was signed by the

Individual Defendants.   Discussing the Company's "foreign currency risk management"

objectives, the 1Q18 10-Q stated as follows:

> The Company considers inventory as an economic hedge against foreign
> currency exposure in accounts payable in certain circumstances. This
> practice offsets such inventory against corresponding accounts payable denominated in
> currencies other than the functional currency of the subsidiary buying the
> inventory when determining the net exposure to be hedged using traditional
> forward contracts. Under this strategy, the Company would expect to increase or
> decrease selling prices for products purchased in foreign currencies based on
> fluctuations in foreign currency exchange rates affecting the underlying accounts
> payable.

73.    Also on June 8, 2017, Tech Data participated in the Robert W. Baird Global

Consumer, Technology and Services Conference.  During the conference, Dutkowsky was asked

about the Technology Solutions integration and what type of challenges, if any, he had seen so

far.  In response, Dutkowsky acknowledged that the two companies "are different."  Expanding

on his comments, he stated:

> And so, we've been able to acknowledge those differences pretty clearly and
> aggressively mobilize our integration efforts to put the pieces together as fast as
> we can. . . .  [W]e have one stream of resources that are focused on the customer
> and the vendor, and to not disrupt the business.  And so, when we had the quarter
> that I showed you the charts on, we're really happy that we're able to do the
> biggest thing in our history and still deliver very strong results.  At the same
> time, there is another team of people that are working on integration.  And those
> work streams are progressing very nicely.

74.     Dutkowsky also said that the Company was on track to achieve $50 million in synergies, which Tech Data had been able to do "without disrupting our customer and vendor relationship."

75.     The statements identified above in ¶63 were materially false and misleading and/or omitted material facts.  Specifically, Defendants knew, or disregarded with severe recklessness, but failed to disclose to investors that:

(a)     The Company was experiencing execution issues in the Technology Solutions components business.  As described in ¶¶46-47, the Technology Solutions components business bought, sold, and priced components differently than did Tech Data and did not hedge for foreign currency exchange fluctuations, while Tech Data did.  This was a meaningful execution challenge, as protecting against foreign currency fluctuations is critical to any international broadline business, and failure to do so adequately bore the potential to severely impact the razor-thin profit margins of Tech Data's European broadline operations.  That potential was realized, to the Company's and investors' detriment in 2Q18 when the Euro – the currency representing Tech Data's largest exposure – strengthened against the U.S. Dollar, saddling Tech Data with higher-priced inventory, which negatively impacted Tech Data's profit margins in Europe.

(b)     The Company was experiencing additional challenges in managing several legacy Technology Solutions high-margin, data center vendors.  The Company's ability to negotiate realistic and achievable vendor rebate programs was critical to Tech Data's profit margins and earnings, as just a relatively small sales shortfall in the high-margin data center business could cause the Company to miss out on "very large margin-rich rebates."

Unbeknownst to investors, however, Tech Data did not have a "deep amount of skills" or experience negotiating with those vendors at the volume, scale, and scope that the Company was required to manage post-acquisition.  As a result, the Company was unable to negotiate achievable vendor rebate programs for 2Q18 with certain data center vendors.  The 2Q18 rebate programs would have been negotiated and set prior to Defendants' statements on June 1, 2017, at which time the Company was already one-third of the way through the quarter.  Tech Data's failure to successfully negotiate vendor rebates caused the Company to miss out on certain sales targets and the "margin-rich rebates" that accompanied them.

(c)     The Company's ability to achieve projected EPS was highly dependent on the Company meeting sales performance targets from certain Technology Solutions data center vendors and obtaining "margin-rich rebates" from those vendors.  Further, Defendants failed to disclose that whether or not Tech Data would even obtain back-end vendor rebates, which directly impact the Company's bottom line and boost profit margins and earnings, often came down to the last month or weeks of the quarter, prior to which time Defendants had little to no visibility as to whether the Company would actually obtain those rebates and, consequently, whether Tech Data's earnings guidance was achievable.

(d)     Tech Data and the technology distribution market as a whole was suffering from an intensely competitive market in the European region in particular, which persisted prior to Defendants' statements on June 1, 2017 and showed no signs of letting up in the second half of fiscal 2018.  While Defendants led investors to believe that the earnings guidance was based on a region-by-region, "bottoms-up, thorough look" at the margin and sales opportunities presenting in 2Q18, the Company had not accounted for the increasingly

competitive European broadline environment in its guidance – a market trend which, as detailed in ¶¶53-55 herein, was well-documented and recognized by Defendants.  Because the European broadline operations comprised a significant portion of Tech Data's net sales, the ongoing trend of heightened competition in the European market and resultant pricing pressures had a large impact on Tech Data's overall earnings each quarter.

(e)     As a result of the execution issues and highly competitive market, which Defendants failed to account for in their 2Q18 guidance, Defendants had no reasonable basis to expect, and did not in fact expect, that Tech Data could achieve 2Q18 EPS in the range of $1.95 to $2.08.

## VI.     THE TRUTH EMERGES

76.     After the market closed on August 31, 2017, just three months after announcing earnings guidance for the second quarter, Tech Data issued a press release reporting its financial results for 2Q18, ending July 31, 2017.  Although Tech Data's net sales of $8.9 billion came in above guidance, investors were stunned by the news that the Company's reported non-GAAP EPS on a diluted basis was only $1.74, materially below the forecasted range of $1.95 to $2.08.  The Company's non-GAAP operating margin also fell from 1.61% the prior quarter to 1.44%.  Analysts were also shocked, as many in the market had anticipated EPS to *exceed* the range Tech Data had provided at the end of 1Q18.  In the press release, Dutkowsky admitted that the Company "did not deliver the earnings we expected in the quarter."

77.     During the earnings call Tech Data held later the same evening, Dutkowsky acknowledged the EPS miss and revealed to investors that gross margin of 5.8% "came in lower than expected, resulting in non-GAAP earnings per share below our plan."   Dutkowsky

attributed the gross profit shortfall to three "very specific factors: *customer and product mix; a competitive market environment; and underperformance in our global computing components business*."

78.     Dutkowsky revealed that in the Americas region, "although data center sales were on plan, within the data center category, sales levels of higher-margin products from certain vendors were lower than expected."  Consequently, Tech Data was unable "to attain the back-end rebates associated with these higher-margin vendors."  Dutkowsky admitted that the vendor relationships were "one of the things that we're learning to deal with in this new Tech Data, which is a larger, more complex business with deeper relationships with *vendors that we don't have deep amount of skills with*."  He later reiterated that the rebate miss was due to Tech Data's inability to manage the new relationships, saying, "Where the rebates impacted Tech Data in the most – in this quarter we just reported, is a few, very large vendors.  The rebate opportunities for us were difficult and *these are not vendors that we have had a long history of managing at the volume and scale and scope that we had to manage* through this quarter."

79.     Dutkowsky also acknowledged, in response to analyst questions, that the vendor relationships at issue were inherited from Technology Solutions, noting that "[t]hey're vendors that we've worked with in the past, but nowhere near the volume and magnitude that we see now as the business opportunity."  Dutkowsky admitted that Tech Data was still "learning to manage the challenges and the complexities" associated with the combined Company and characterized the vendor rebate issue as an execution problem: "*that's why we can say that [the vendor rebate issue] fits into that category of execution*."

80.     Another analyst questioned Defendants about when the "misexecution, pricing and rebate issues started to occur" given that "it was approximately 3 months ago when you gave your outlook for this quarter ***and you were about already a month into the quarter***." Dutkowsky admitted that "the profitability shows up towards the end of the quarter when rebate attainment comes up short. . . .  And then when we get to the end, we came up short on the rebates.  So that was a big component, big piece of the performance in the quarter on a profitability perspective."  Dannewitz further disclosed, "[s]o it's – until we get to the close to the very end and there's a hockey stick, of course, on certain of our vendor programs, we don't know if we're going to make it or miss it."

81.     As to Tech Data's other, previously concealed execution problem, Dutkowsky admitted on the earnings call that "the biggest contributor to the European shortfall was, in fact the components business. And that's where, as we said in our prepared comments, we had some execution issues that impacted the way we bought and sold products in that space. And it impacted our profitability."  Dutkowsky later specified that the execution issues stemmed from previously undisclosed challenges related to Technology Solutions' foreign exchange rate hedging policies, stating:

> [I]n terms of the operational issues, the execution issues – that's one example of where TS had a discrete components business and Tech Data had a discrete components business spread across multiple countries.  And it was one of the – as we put the 2 pieces together, we had very different policies and practices in place that we needed to justify.  TS and Tech Data bought products differently, they hedged the value of those products differently, they priced them differently in the market, and so those weaknesses impacted our performance in the quarter. All of those issues are solvable.  It's just that they impacted us in this quarter in a way that was much larger than we anticipated.

82.     Dutkowsky also revealed during the earnings call that "a highly competitive European market contributed to the gross margin decline" in Tech Data's component business. While Dutkowsky affirmed that the Company had not determined what portion of the margin impact in Europe was from the execution issues and what was from the competitive market, he reiterated to analysts that "it was a combination of customer and product mix.  The competitive nature of the market and then our execution in components business.  Those things combined were the ones that generated the shortfall."

83.     Analysts were taken aback that the consistently competitive European market could account for the unexpected margin shortfall, as the competition in the European broadline market was well-understood and had been documented over the past few quarters.  Dutkowsky could offer no credible explanation as to why the competitive market had not been sufficiently factored in to the EPS guidance, as demonstrated in this exchange one analyst had with Dutkowsky:

> Analyst:  As it relates to the European competitive environment, I mean, my understanding is this environment [has] always been very competitive. So I mean, has it reached a point of irrational pricing? Or is there a sense of desperation by some of your competitors that made it much more drastic this quarter than what we've seen in past?
>
> Dutkowsky:  ***Yes, you're right. It's always competitive***.  The whole IT distribution space is a competitive environment, one that we've executed [in] very well in the past.  There are ebbs and flows with competitiveness just like there are ebbs and flows with the rebate programs.  And my sense is that in this moment in time, the market is more competitive than it's been over the last few quarters.

84.     That Tech Data had not accounted for the competitive European environment in its 2Q18 guidance is clear from the emphasis Tech Data executives placed on the fact that it ***was*** accounted for in the third quarter 2018 ("3Q18") earnings guidance announced with the 2Q18

results.  When asked whether the same competitive European environment seen in 2Q18 was accounted for in the guidance for 3Q18, Dannewitz stated that, "[w]ithin our guidance, we've projected a bottoms-up approach to where we think the margin attainment's going to be on the various customer sets. So it's built into our guidance, *the competitive nature in Europe* and across our product sets."

85.     As a result of the information revealed to the market, the Company's stock dropped approximately 21%, or -$22.83, falling from a close of $110.29 per share on August 31, 2017, to a close of $87.46 per share on September 1, 2017.  The price of Tech Data stock continued to fall after the market re-opened on September 5, 2017 following the Labor Day holiday, tumbling another $3.98 on September 5, 2017 to close at $83.48.

## VII.     ADDITIONAL ALLEGATIONS OF SCIENTER

86.     The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly made materially false and misleading statements and/or omissions, or acted severely recklessly in doing so, during the Class Period.

87.     Defendants knew, or disregarded with severe recklessness, that significant differences between Tech Data's and Technology Solutions' foreign exchange hedging policies existed at the time they issued the statements referenced in ¶¶63-74.  Not only had the Company conducted thorough due diligence into Technology Solutions prior to the acquisition, but Tech Data had hired many of Technology Solutions' key employees into senior leadership roles in the combined organization.  For example, as described above in ¶42, Tech Data hired Zammit, Technology Solutions' Global President and the individual responsible for Technology

Solutions' strategic direction, day-to-day operations, and global performance, as the European President of the new Tech Data.  Zammit reported to COO Rich Hume, who in turn reported to Dutkowsky.  At the time Defendants issued the misstatements and omissions identified in ¶¶63-74, Technology Solutions had been part of Tech Data for three full months, and Tech Data was touting the fact that it had an integration team dedicated to studying and combining the two legacy companies' business practices.  Moreover, as senior executives with extensive experience in the distribution channel and/or backgrounds in finance, the Individual Defendants also would have understood the importance of having reliable and consistent foreign currency exchange hedging policies in the broadline distribution business in order to protect Company margins from significant currency fluctuations, and that the absence of such policies would present serious execution challenges.

88.    Defendants also knew, or disregarded with severe recklessness, that the lack of foreign currency exchange hedging in the Technology Solutions components business would negatively impact the Company's profit margins in 2Q18, as the Euro – the foreign currency to which Tech Data had the largest exposure – had been strengthening against the U.S. dollar since January 2017.  In fact, from May 1, 2017, the first day of Tech Data's 2Q18, to June 1, 2017, when Defendants made their first materially false statements and omissions, the Euro increased from 1.09 to a high of 1.12 against $1 U.S.  Thus, at the time Defendants made their statements on June 1, 2017, the negative effects of the lack of hedging in the Technology Solutions components business to such foreign currency exchange fluctuations would have been known to Defendants, or were disregarded by them with severe recklessness.

89.     The acquisition of Technology Solutions also ensured that the Individual Defendants were aware, and focused on the progress, of the vendor relationships each company brought to the "new Tech Data."  Indeed, Dutkowsky represented during his October 10, 2017 Investor Day presentation that he had personally spoken with executives at vendors previously not on Tech Data's linecard to develop new relationships in light of the acquisition of Technology Solutions and Tech Data's publicly announced intent to become a uniquely "end-to-end" distributor.

90.     The Company's execution issues and the competitive market environment would have also become evident to Defendants during the Company's internal plan and forecasting process, as described above in ¶55.  Further, after the Class Period, at Tech Data's October 10, 2017 Investor Day, in response to an analyst inquiry as to how Tech Data was dealing with the competitive challenges in Europe noted on the 2Q18 earnings call, Zammit admitted that the competitive pressure Tech Data had seen in the second quarter "continues to be there . . . we've got no relief in Q3 on those pressures, ***but it has been taken into account in the guidance***."  In other words, the competitive pressure existed prior to and during the second quarter, yet Defendants failed to account for it in its 2Q18 earnings guidance.

91.     That Defendants knew, or disregarded with severe recklessness, that their misstatements and omissions were materially false is also supported by their ready access to a wealth of information regarding Tech Data's operations, sales, and product trends.  Tech Data has repeatedly praised its state-of-the-art information technology system, SAP, to investors, with Dutkowsky referring to SAP as "a huge competitive advantage relative to what [Tech Data's] competitors bring to the market with their IT systems and their backbones."  The SAP system is

used for, and centralizes data related to, Tech Data's back office functions, including product data management, product master management, credit synchronization, and pricing functions and tools.  As Dutkowsky explained to investors at a December 5, 2017 conference, "we do about 55,000 transactions a day. Our average order size is around $2,000.  We sell about $100 million, roughly $120 million to $150 million a day.  All of that's done through one consistent IT platform around the world."  During the Company's October 10, 2017 Investor Day, Chief Information Officer John Tonninson said that SAP provided a "wildly fast, incredibly flexible ability to pivot and consolidate and analyze and stratify the data" regarding Tech Data operations.  Defendants, therefore, had the ability to access and monitor the very same information which would allow them to know, or disregard with severe recklessness, that their earlier statements were false and misleading.

92.      The fact that Defendants provided 2Q18 guidance on June 1, 2017, at which time one-third of the Company's actual results for the quarter were already in the books, further supports the inference that Defendants knew, or disregarded with severe recklessness, that Tech Data's 2Q18 guidance lacked a reasonable basis and could not be achieved.  Defendants' misstatements and omissions were also made at the end of the first quarter in which Tech Data reported results for the integrated Technology Solutions business, as well as at a time when the Company's financials and operations were under heightened scrutiny, both internally and externally from analysts and investors.  In fact, the previous quarter, Defendants had declined to provide guidance, but reassured investors that they would give guidance once the Company had gained a level of comfort with, and visibility into, Technology Solutions' business that would enable them to do so.

93.     A strong inference that Defendants knew, or disregarded with severe recklessness, that they were deceiving the public is also raised by Dutkowsky's suspicious trading activity during the Class Period.  On June 22, 2017, less than one month after Defendants issued the materially false and misleading statements about Tech Data's 2Q18 rosy earnings prospects, flourishing vendor relationships, and impressive ability to execute and almost two-thirds of the way through 2Q18, Dutkowsky sold 20,000 shares of Tech Data stock, or 13.9% of his holdings (excluding hold-to-retirement stock units).   Dutkowsky's June 22, 2017 sales resulted in proceeds of over $2,000,000.  This was Dutkowsky's first sale of stock since March 2016, when he sold 1,200 shares.

## VIII.   LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

94.     As detailed herein, Defendants' fraudulent scheme artificially inflated the Company's stock price by misrepresenting and concealing the true nature of the Company's financial prospects for 2Q18.  Defendants' false and misleading statements and omissions, individually and collectively, concealed that: (a) fierce industry competition in Europe was putting downward pressure on the Company's margins, which Tech Data failed to include in its guidance for 2Q18; (b) the Company was experiencing execution issues in the Technology Solutions components and data center businesses; and (c) a large portion of the Company's EPS guidance was dependent on the Company obtaining back-end vendor rebates, which it ultimately did not earn.  While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price and give the market the false notion that the merger of Tech Data with Technology Solutions had strengthened Tech Data's overall operations, profit margins, and financial outlook.

Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $111.10 per share during the Class Period, on August 30, 2017.

95.     The truth emerged after the market closed on August 31, 2017, when, as detailed in ¶¶76-85, above, the Company shocked investors by announcing that its non-GAAP EPS on a diluted basis for 2Q18 was $1.74, substantially less than the previously forecasted range of $1.95 to $2.08.   Defendants attributed the miss to "execution issues that impacted the way [the Company] bought and sold [broadline] products" in Europe; increased competitiveness in the European broadline space; and failure to obtain rebates from several large vendors, which accounted for "a significant piece of the shortfall" in the Americas' operating margin.   As a result of the information revealed to the market, the Company's stock dropped approximately 21%, or -$22.83, falling from a close of $110.29 per share on August 31, 2017, to a close of $87.46 per share on September 1, 2017.   The price of Tech Data stock continued to fall when the markets re-opened after the Labor Day holiday, falling another $3.98 on September 5, 2017 to close at $83.48.   These declines in the Company's stock price were the direct result of the nature and extent of the revelations made to the market regarding the nature of Tech Data's operations and the precariousness of its profit margins.

96.     The timing and magnitude of the Company's stock price decline on an unusually high volume on September 1, 2017 negates any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.



97.     In sum, the rapid declines in the Company's stock price on September 1, 2017

through September 5, 2017 were the direct and foreseeable consequence of the revelation of the

falsity of Defendants' Class Period misrepresentations and omissions to the market.  Thus, the

revelations of truth, as well as the resulting clear market reaction, support a reasonable inference

that the market understood that Defendants' prior statements were false and misleading.  In

short, when the truth about Defendants' prior misrepresentations and concealments was revealed,

the Company's stock price quickly sank, the artificial inflation came out of the stock, and

Plaintiff was damaged, suffering true economic losses.

98.     Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff on September 1, 2017 and through September 5, 2017, were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

99.     At all relevant times, the market for Tech Data stock was an efficient market for the following reasons, among others:

(a)     Tech Data common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Tech Data filed periodic public reports with the SEC and the NASDAQ;

(c)     Tech Data regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Tech Data was followed by numerous securities analysts employed by major brokerage firms, including Bank of America Merrill Lynch, Citigroup, Cross Research, Loop Capital Markets, Needham, Northcoast Research, Pivotal Research Group, Raymond James, and Stifel, who wrote reports which were distributed to brokerage firms' sales forces and

certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

100.     As a result of the foregoing, the market for Tech Data stock promptly digested current information regarding Tech Data from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Tech Data stock during the Class Period suffered similar injury through their purchase of Tech Data stock at artificially inflated prices, and a presumption of reliance applies.

101.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material, adverse information regarding Tech Data's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.     NO SAFE HARBOR

102.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the purportedly

forward-looking statements.

103.    Indeed, the risk warnings that were provided by Defendants in their Class Period

statements included boilerplate statements,[5] such as:

- Our ability to earn profit is more challenging when sales slow from a down economy as a result of gross profit declining faster than cost reduction efforts taking effect.

- Our competitors can take more market share by reducing prices on vendor products that contribute the most to our profitability.

- Failure to obtain adequate product supplies from our largest vendors, or terminations of a supply or services agreement, or a significant change in vendor terms or conditions of sale by our largest vendors may negatively affect our net sales and operating profit.

- We conduct business in countries outside of the United States, which exposes us to fluctuations in foreign currency exchange rates that result in losses in certain periods.

- We have international operations which expose us to risks associated with conducting business in multiple jurisdictions.

- We may encounter difficulties in fully integrating TS into our business and may not fully achieve, or achieve within a reasonable time frame, expected strategic objectives and other expected benefits of the acquisition.

- TS may underperform relative to our expectations.

104.    These or other materially identical risk disclosures were disseminated throughout

the Class Period and did not serve to adequately inform the market of the true risks and actual

operational experience of the Company.  Indeed, that these stated warnings were inadequate and

provided no new, meaningful information, is evident from the market's reaction to the revelation

of Defendants' untrue and/or misleading statements.  *See, e.g.*, ¶¶85, 94-98.

---

[5]    *See* Tech Data Form 10-K for the year ended January 31, 2017, at Part I, Item 1A ("Risk Factors").

105.     Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Tech Data who knew that the statement was false when made.  Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XI.     CLASS ACTION ALLEGATIONS

106.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Tech Data stock between June 1, 2017 and August 31, 2017, inclusive, and who were damaged thereby ("Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

107.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tech Data stock was actively traded on the NASDAQ.  While the exact number of Class members can only be determined by appropriate discovery, Tech Data reported 212 shareholders of record and over 14,000 beneficial holders of stock as of March 15, 2017.  Accordingly, Plaintiff believes that the number of Class members is at least in the thousands and that they are geographically dispersed.  Record owners and other

Class members may be identified from records maintained by Tech Data or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

108.    Plaintiff's claims are typical of the claims of the other Class members because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

109.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

110.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

111.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)    whether the market prices of Tech Data stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I:

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

112.    Plaintiff repeats and realleges the allegations in ¶¶1-111 above, as if fully set forth herein.

113.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or disregarded with severe recklessness, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

115.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Tech Data stock.  Plaintiff and the Class would not have purchased Tech Data stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

116.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of Tech Data stock during the Class Period.

## COUNT II:

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST THE INDIVIDUAL DEFENDANTS

117.    Plaintiff repeats and realleges the allegations in ¶¶1-111 above, as if fully set forth herein.

118.    During the Class Period, the Individual Defendants acted as controlling persons of Tech Data within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about the Company, the Individuals Defendants had the power and ability to control the actions of the Company and their employees.  Tech Data

controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  February 28, 2018                    ROBBINS GELLER RUDMAN
                                                                     & DOWD LLP

                                                                     *s/ Jack Reise*
                                                                     JACK REISE

JACK REISE
Florida Bar No. 058149
STEPHEN R. ASTLEY
Florida Bar No. 0139254
MAUREEN E. MUELLER
Florida Bar No. 110407
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
mmueller@rgrdlaw.com

*Lead Counsel for Plaintiff*

VANOVERBEKE, MICHAUD
   & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Plaintiff*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on February 28, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*s/ Jack Reise*

JACK REISE
Florida Bar No. 058149
