UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NEALAN BHATT, Individually and on
Behalf of All Others Similar Situated,

     Plaintiff,

v.                                                                          Case No. 8:17-cv-02185

TECH DATA CORPORATION, ROBERT
M. DUTKOWSKY and CHARLES V.
DANNEWITZ,

     Defendants.                                    **DISPOSITIVE MOTION**

_____/

## <u>DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT</u>

Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 (the "<u>PSLRA</u>"), Defendants Tech Data Corporation ("<u>Tech Data</u>" or the "<u>Company</u>"), Robert M. Dutkowsky, and Charles V. Dannewitz (collectively, "<u>Defendants</u>") move to dismiss all claims asserted against them in Lead Plaintiff Wayne County Employees' Requirement System's ("<u>Plaintiff</u>") Amended Class Action Complaint (Dkt. 44) (the "<u>Amended Complaint</u>" or "<u>Am. Cplt.</u>").

## I.    INTRODUCTION

The Amended Complaint must be dismissed because it: (a) challenges statements related to earnings guidance and anticipated performance, which are all protected by the PSLRA's safe harbor for forward-looking statements; (b) relies on statements that are not actionable because they are merely expressions of corporate optimism; and (c) fails to allege facts necessary to satisfy the heightened pleading standards under the PSLRA. Because

Plaintiff has not cured these deficiencies, which were noted in Defendants' first motion to dismiss, the Amended Complaint must now be dismissed with prejudice.

Tech Data's share price declined after it announced one quarter's earnings following a large acquisition. Relying merely on the date of the earnings announcement and the share price decline, this baseless "strike suit" was initiated shortly thereafter. Now, despite having ample time to amend the initial pleading, with knowledge of Defendants' defenses briefed in their motion to dismiss the initial complaint, Plaintiff still does nothing more than allege "fraud by hindsight." For example, Plaintiff alleges that the earnings guidance provided was materially false and misleading. But in support of its conclusion, Plaintiff only alleges that the actual earnings were lower than projected. This is not sufficient.

Earnings guidance is a classic example of a forward-looking statement, protected by the PSLRA's safe harbor, which immunizes Defendants from liability for claims arising from forward-looking statements accompanied by cautionary disclosures. Plaintiff's amended allegations are carefully worded in a bald attempt to avoid the Company's cautionary disclosures. Regardless, this Court can, and should, take judicial notice of the full text of these publicly filed disclosures in granting this motion to dismiss under the PSLRA.

Dismissal is also required because the Amended Complaint fails to set forth any statements that are misleading and because it fails to identify facts sufficient to establish the required element of scienter. Most tellingly, Plaintiff misleadingly directs the Court to a single stock sale by one of the two individual defendants in June 2017, implying wrongful conduct. Plaintiff inaccurately compares a 2017 stock sale by one of the individual defendants to a relatively small sale in 2016, **but omits a much larger sale on that same date**, as well as the

45060264;1

prior five-year history, which reflect the routine nature of the 2017 stock sale. The fully disclosed sale history reveals there is no basis for Plaintiff to allege scienter here. These incomplete and misleading allegations illustrate that even with ample time to amend, Plaintiff cannot state a claim against Defendants.

## II.    FACTUAL BACKGROUND

Tech Data, the largest publicly traded company, in Tampa Bay, and in Florida, is a wholesale distributor of technology products and solutions. Tech Data serves as a link in the technology supply chain by bringing products from technology vendors to market and providing its customers with logistic capabilities and services. Am. Cplt., ¶ 18. On September 19, 2016, Tech Data announced that it had entered into an agreement to acquire the Technology Solutions ("TS") business from Avnet, Inc. *Id.*, ¶ 33. Just over five months later, on February 27, 2017, Tech Data completed the acquisition for an aggregate purchase price of over $2.5 billion (the "TS Acquisition"). *Id.*, ¶¶ 3, 33.

### A.    Defendants Appropriately Did Not Provide Guidance Immediately After The Acquisition.

Less than two-weeks after the TS Acquisition, on March 8, 2017, Tech Data issued a press release, also attached as Exhibit 99.1 to the Form 8-K Tech Data filed with the United States Securities And Exchange Commission ("SEC"), and held an investor conference call, announcing Tech Data's financial and operating results for the quarter ending January 31, 2017 (the "March 8 Press Release"). *Id.*, ¶¶ 36-37; *see also* Tech Data's SEC Form 8-K for the fiscal

quarter ending January 31, 2017, attached as **Exhibit 1**, at p.4; March 8, 2017, Earnings Call Transcript, attached as **Exhibit 2**.[1]

Before closing on the TS Acquisition, Defendants received very limited financial disclosures about TS, which remained a competitor. *Id.*; Ex. 2, p.16 (stating that Defendants had no visibility into TS earnings "other than what you saw on public calls."). Thus, due to the short time frame between the reporting of Tech Data's results and completion of Tech Data's acquisition of Avnet's TS business, Tech Data did not provide financial guidance for its first quarter of fiscal year 2018 (*i.e.*, the quarter ending April 30, 2017). Am. Cplt., ¶¶ 36-37; Ex. 2, p. 5 ("Given the short time frame between closing and reporting of our Q4 results, we will not be providing financial guidance for Q1 of FY18."). Tech Data indicated that it planned to resume providing guidance with its first-quarter fiscal year 2018 results, and then "to hold an investor day in the fall of 2017" to "present detailed operating and financial models for the new Tech Data." *See* Ex. 2, p. 5.

### B.    Defendants Disclosed Specific, Anticipated Risks.

Tech Data filed its annual report for the year ending January 31, 2017, on March 30, 2017 (the "2017 Annual Report"), attached as **Exhibit 3**, which specifically disclosed several risk factors relevant to Plaintiff's claims. Tech Data cautioned investors that there were risks associated with the integration of the TS business:

> **We may encounter difficulties in fully integrating TS into our business and may not fully achieve, or achieve within a**

---

[1] It is well-settled that on a motion to dismiss a securities fraud action, the Court may consider any public records and documents, including SEC filings, which are central to a plaintiff's claims or referred to in the complaint. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999); *Allyn v. CNL Lifestyle Properties, Inc.*, No. 6:13-cv-132, 2013 WL 6439383 (M.D. Fla. Nov. 27, 2013) (granting motion to dismiss after taking judicial notice of SEC filings). Tech Data attaches as Exhibits 1-15, the SEC Form 8-Ks, Form 10-K, Earnings Call Transcripts, and Form 4s, referenced in or related to allegations in the Amended Complaint.

**reasonable time frame, expected strategic objectives and other expected benefits of the acquisition.**

… <u>There may be substantial difficulties, costs and delays involved in the integration of TS with our own business, including</u> distracting management from day-to-day operations, potential incompatibility of corporate cultures, and costs and <u>delays in implementing common</u> systems and <u>procedures</u>. … Any one or all of these factors may increase our operating costs or lower our anticipated financial performance. …

*See* Ex. 3, 2017 Annual Report, ITEM 1A *Risk Factors*, p. 12 (bold emphasis in original, underlined emphasis added).

Tech Data also cautioned investors that the TS business may not perform as anticipated:

**TS may underperform relative to our expectations.**

Following the acquisition of TS, we may not be able to maintain the levels of revenue, earnings or operating efficiency that we and TS have achieved or might achieve separately. The business and financial performance of TS are subject to certain risks and uncertainties. We may be unable to achieve the same growth, revenues and profitability that TS has achieved in the past. Our failure to do so could have a material adverse effect on our financial condition and results of operations.

*See id.* (bold emphasis in original).

Tech Data further cautioned investors that changes to rebate terms could negatively impact profits, especially since its vendors had superior negotiating power:

**Failure to obtain adequate product supplies from our largest vendors, … or a significant change in vendor terms or conditions of sale by our largest vendors may negatively affect our net sales and operating profit.**

The Company receives a significant percentage of revenues from products it purchases from certain vendors, such as Apple, Inc., HP Inc. and Cisco Systems Inc. <u>These vendors have significant negotiating power over us and rapid, significant and adverse changes in sales terms and conditions, such as reducing the amount of price protection and return rights as well as reducing the level of</u>

5

> purchase discounts and rebates they make available to us, may
> reduce the profit we can earn on these vendors' products and result
> in loss of revenue and profitability. The Company's gross profit
> could be negatively impacted if the Company is unable to pass
> through the impact of these changes to the Company's customers or
> cannot develop systems to manage ongoing vendor programs. ...

*See id.*, p. 11 (bold emphasis in original, underlined emphasis added).

And, Tech Data cautioned investors that profits could be hurt by economic conditions:

> **Our ability to earn profit is more challenging when sales slow
> from a down economy as a result of gross profit declining faster
> than cost reduction efforts taking effect.**
>
> … The economic environment may also result in changes in vendor
> terms and conditions, such as rebates, cash discounts and
> cooperative marketing efforts, which may also result in downward
> pressure on our gross profit. …
>
> The Company operates in a highly competitive environment.

*See id.*, p. 10 (bold emphasis in original).

Tech Data further cautioned investors that it could suffer losses from fluctuations in

foreign currency exchange rates:

> **We conduct business in countries outside of the United States,
> which exposes us to fluctuations in foreign currency exchange
> rates that result in losses in certain periods.**
>
> … exposes the Company to fluctuations in foreign currency
> exchange rates. The Company may enter into shortterm forward
> exchange or option contracts to hedge this risk. Nevertheless,
> volatile foreign currency exchange rates increase our risk of loss
> related to products purchased in a currency other than the currency
> in which those products are sold. While we maintain policies to
> protect against fluctuations in currency exchange rates, extreme
> fluctuations have resulted in our incurring losses in some countries.
> The realization of any or all of these risks could have a significant
> adverse effect on our financial results. …

*See id.*, p. 11 (bold emphasis in original).

6

In addition, Tech Data cautioned investors about potential delays in its efforts to implement common procedures for legacy Tech Data and the acquired TS operations. *Id.*, p. 13 ("There may be substantial difficulties, costs and delays involved in the integration of TS with our business, including … costs and **delays in implementing common** systems and **procedures**.") (emphasis added).

Plaintiff brushes off these key cautionary disclosures and the identified risk factors, Am. Cplt., ¶ 103, despite the fact that Tech Data incorporated them into the subsequent statements upon which the Plaintiff relies. But this Court can, and should, consider them. *See Bryant*, 187 F.3d at 1287; *Allyn*, 2013 WL 6439383.

### C.      The June 1, 2017 And August 31, 2017 Statements.

Less than three months later, on June 1, 2017, Tech Data issued a press release, also attached as Exhibit 99.1 to the Form 8-K Tech Data filed with the SEC on that date (the "June 1 Press Release"), announcing Tech Data's financial and operating results for the quarter ending April 30, 2017 (the first quarter of the Company's 2018 fiscal year, *i.e.*, "1Q18"). Am. Cplt., ¶ 43; *see also* Tech Data's SEC Form 8-K for the fiscal quarter ending April 30, 2017, attached as **Exhibit 4**, at p. 4. Tech Data held an investor conference call that same day. *See id.*; June 1, 2017, Earnings Call Transcript, attached as **Exhibit 5** (the "June 1 Earnings Call").

On August 31, 2017, Tech Data issued another press release, which it filed that same day with the SEC as Exhibit 99.1 to its Form 8-K (the "August 31 Press Release"), announcing Tech Data's financial and operating results for the quarter ending July 31, 2017, which fell short of expectations (*i.e.*, "2Q18"). *Id.*, ¶ 56; *see also* Tech Data's SEC Form 8-K for the fiscal quarter ending July 31, 2017, at p. 6, attached as **Exhibit 6**. Tech Data also held an investor

conference call that same day. *Id.*, ¶ 57, *see also* August 31, 2017 Earnings Call Transcript (the "August 31 Earnings Call"), attached as **Exhibit 7**.

On September 1, 2017, when the markets reopened, the Company's stock price fell. Am. Cplt., ¶ 12. Plaintiff alleges that it and the putative class have suffered damages by paying "artificially inflated prices" for the Company's stock. *Id.*, ¶ 115.

Plaintiff attempts to incorporate Defendants' August 2017 explanation for the shortfall into its allegations of false statements. Am. Cplt., ¶¶ 43-53. But critically, Plaintiff does not state a single specific factual allegation to support its contention that any of the explanations provided in August 2017 were known in June 2017. *Id.*

**D.      The Amended Complaint Omits Critical Cautionary Disclosures.**

Both the June 1 Press Release and June 1 Earnings Call (collectively, the "June 2017 Statements") included robust cautionary language regarding the forward-looking nature of the information provided. Tech Data cautioned that projections of future performance were forward-looking statements, and also identified the words used in such statements as follows:

> *Words such as "expects," "anticipates," "targets," "goals," "projects," "intends," "plans," "believes," "seeks," "estimates," variations of such words, and similar expressions **are intended to identify such forward looking statements**. In addition, any statements that refer to **projections of Tech Data's or Technology Solutions' future financial performance**, our anticipated growth and trends in our businesses, and other characterizations of future events or circumstances, **are forward looking statements**. These **forward looking statements are only predictions and are subject to risks, uncertainties, and assumptions**. Therefore, actual results may differ materially and adversely from those expressed in any forward looking statements.*

*See* Ex. 4, p. 5 (emphasis added).

The June 1 Press Release specifically stated:

**Forward-Looking Statements**

*Certain statements in this communication may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These statements, including statements regarding Tech Data's plans, objectives, expectations and intentions relating to the Technology Solutions business ("Technology Solutions"), Technology Solutions' expected contribution to Tech Data's results, the expected benefits of Technology Solutions, **Tech Data's and Technology Solutions' financial results and estimates and/or business prospects involve a number of risks and uncertainties and actual results could differ materially from those projected**. These forward looking statements are based on current expectations, estimates, forecasts, and projections about Technology Solutions and the operating environment, economies and markets in which Tech Data and Technology Solutions operate and the beliefs and assumptions of our management.*

*See id.* (emphasis added).

Tech Data also referred investors back to its previously filed 2017 Annual Report, for

a more detailed explanation of the risks that might affect Tech Data in the future:

*For additional information with respect to risks and other factors which could occur, **see Tech Data's Annual Report on Form 10K for the year ended January 31, 2017, including Part I, Item 1A, "Risk Factors" therein**, Quarterly Reports on Form 10Q, Current Reports on Form 8K and other securities filings with the Securities and Exchange Commission (the "SEC") that are available at the SEC's website at www.sec.gov and other securities regulators. Readers are cautioned not to place undue reliance upon any such forward looking statements, which speak only as of the date made. Many of these factors are beyond Tech Data's control. …*

*See id.* (emphasis added).

Tech Data opened the June 1 Earnings Call using similar language, directing listeners

to the risk factors, and expressly warning investors:

Before we begin, I would like to remind all listeners that today's earnings press release and certain matters discussed in today's call

may include forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. These statements are based on the company's current expectations and are subject to risks and uncertainties. **These risks and uncertainties include, but are not limited to, those factors identified in the press release** and in our filings with the Securities and Exchange Commission, including those filings related to our acquisition of Avnet's Technology Solutions business, **as well as our most recent annual report on Form 10-K, which identify important risk factors that could cause actual results to differ materially from those contained in the forward-looking statements**.

Please be advised that the statements made today during today's call should be considered to represent the expectations of management as of the date of this call. The company undertakes no duty to update any forward-looking statements to actual results or changes in expectation.

*See* Ex. 5, p. 2 (emphasis added).

This Court's consideration of the disclosures and identified risks, as well as other deficiencies in the Plaintiff's pleading set forth below, requires the dismissal of the Amended Complaint.

**E.    The Amended Complaint Misleadingly Omits Defendants' Relevant Sale History.**

Unable to state with particularity any facts giving rise to a strong inference that Defendants acted with the required state of mind, the Amended Complaint stretches when it points to one sale of stock by Mr. Dutkowsky on June 22, 2017. Am. Cplt., ¶¶ 60, 93.[2] Yet Plaintiff failed to inform the Court that Mr. Dutkowsky routinely sells (and acquires) shares every year, as shown in his publicly filed Form 4s, attached as **Exhibits 8-12**:

---

[2] Plaintiff concedes that the timing of this sale was not immediately prior to the stock drop, but rather, "a little over two months" before. Am. Cplt. ¶ 60.

45060264;1

| Sale Date | No. of Shares Sold | Form 4 Date | Shares Owned After Sale | Exhibit |
|---|---|---|---|---|
| 3/8/2013 | 40,000 | 3/8/2013 | 195,428 | 8 |
| 4/11/2014 | 20,000 | 4/15/2014 | 151,277 | 9 |
| 4/14/2014 | 20,000 | 4/15/2014 | 210,549 | 9 |
| 9/21/2015 | 10,000 | 9/21/2015 | 231,459 | 10 |
| 3/11/2016 | 14,000 | 3/11/2016 | 217,459 | 11 |
| 6/22/2017 | 20,000 | 6/22/2017 | 234,613 | 12 |

Mr. Dutkowsky's sale history is important. Plaintiff misrepresents his March 2016 sale as totaling 1,200 shares to support its allegation that the June 22, 2017 sale of 20,000 shares was unusual. But Mr. Dutkowsky actually had <u>two</u> sales totaling 14,000 shares on March 11, 2016, and had sold between 10,000 and 40,000 shares annually since 2013. *Compare* Am. Cplt., ¶ 93 *with* Exs. 8-12. Notably, despite the 2017 sale, Mr. Dutkowsky's ownership interest remained higher than after any of his prior sales over the past several years because like other executives, Mr. Dutkowsky is routinely awarded additional shares in the Company. *See* Exs. 8-12; Exhibits 13 –15 (additional filed Form 4s reflecting share acquisitions).

## III.   MEMORANDUM OF LAW

### A.   The PSLRA Imposes Heightened Pleading Standards For Federal Securities Claims.

Plaintiff attempts to assert two claims in its Amended Complaint for securities fraud under the Exchange Act: (i) violation of Section 10(b) and Rule 10b-5; and (ii) violation of Section 20(a). To state a viable claim for securities fraud, Plaintiff must allege: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which Plaintiff justifiably relied; (5) that proximately caused Plaintiff's injury. *See Bryant*, 187 F.3d at 1281. The PSLRA significantly heightened the pleading standards for these elements of federal securities claims to combat abusive strike suits. *Id.* at 1273.

45060264;1

The PSLRA imposes two conditions to state a claim. Unless both are satisfied, dismissal is **mandatory**. *See* 15 U.S.C. § 78u-4(b)(3)(A) ("the court **shall**, on the motion of any defendant, **dismiss the complaint** if the requirements of paragraphs (1) and (2) are not met.") (emphasis added). First, Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief … state with particularity all facts on which that belief is formed." *Id.* § 78u-4(b)(1). Second, Plaintiff must "with respect to *each act or omission alleged* . . . state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). To overcome this threshold, Plaintiff must allege facts giving rise to "an inference of scienter" that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). A "plaintiff must plead scienter with particular facts that give rise to a strong inference that the defendant acted in a severely reckless manner." *Bryant*, 187 F.3d at 1287.

This is a difficult standard, and even if Plaintiff were able to allege facts sufficient to establish "inexcusable negligence" – which Plaintiff has not done here – it would still not be enough. *See Durgin v. Mon*, 415 F. App'x 161, 164 (11th Cir. 2011) (holding that for scienter, the PSLRA requires that the complaint allege "with particularity facts giving rise to a *strong inference* that the defendant acted with the *required state of mind*" meaning an "intent to deceive, manipulate, or defraud" or "severe recklessness.") (emphases in original) (internal citations omitted). In *Durgin*, the Eleventh Circuit affirmed the dismissal because the amended

complaint failed to satisfy the PSLRA's standard for pleading scienter. *Id.* After considering the "amended complaint as a whole," the allegations were not sufficient to "give rise to a 'strong inference' of either fraudulent intent or severe recklessness" that was "'at least as compelling as any opposing inference of' conduct that did not violate § 10(b)" *Id.* (citing *Tellabs*, 551 U.S. at 314). The Eleventh Circuit further explained that "severe recklessness" was limited to "*highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care." *Id.* at 166 (internal quotation omitted) (emphasis added in *Durgin*).

### B.  The Amended Complaint Fails To State A Claim.

The Amended Complaint must be dismissed because it fails to adequately plead the necessary elements under Section 10(b) and Rule 10b-5. Plaintiff's failure to adequately plead a primary violation of Section 10(b) in Count I of the Complaint is also fatal to the dependent Section 20(a) claims in Count II against the individual Defendants. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.")

### 1.  Plaintiff's Claims Are Based On Non-Actionable Forward-Looking Statements Accompanied By Cautionary Disclosures.

Plaintiff's claims are barred because they are premised on non-actionable forward-looking statements, which were accompanied by the requisite meaningful cautionary disclosures. *Bryant*, 187 F.3d at 1276. The PSLRA contains a safe harbor that protects "'forward-looking statements' from serving as a basis of liability in private securities fraud suits if the statements qualify as 'forward-looking' under 15 U.S.C. §§ 78u-5(i)(1)(A)-(F), and

meet any one of the statutory conditions set forth in 15 U.S.C. §§ 78u-5(c)(1)(A)-(B)." *Id.*

"Forward-looking statements" include projections of revenue, earnings (including earnings per

share), statements of plans and objectives of management for future operations, and statements

of future economic performance. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(C).

The statements at issue are not even a close call. The Amended Complaint specifically

challenges Tech Data's forward looking statement regarding its anticipated earnings per share

as the foundation of both claims. Am. Cplt., ¶ 63 ("Tech Data ***anticipated*** worldwide net sales

to be in the range of $8.55 billion to $8.80 billion and non-GAAP ***EPS*** in the range of $1.95

to $2.08) (emphasis added), ¶ 75 ("The statements identified above in ¶ 63 were materially

false and misleading and/or omitted material facts."). Yet, projections of revenue and earnings

per share are specifically included within the definition of "forward-looking statements"

subject to the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5(i)(1)(A). Similarly, statements on

how the company would execute over the next quarter, its ongoing efforts to optimize its

vendor relationships, and the forecast regarding the competition level in Europe are statements

of "plans and objectives" and "future economic performance" that fall within the definition of

"forward-looking statements" *Id.*, § 78u-5(i)(1). Defendants are shielded from liability for

these forward-looking statements that were accompanied by meaningful cautionary language.

*See* 15 U.S.C. § 78u-5(c)(1)(A)(i).

In addition to the PSLRA's safe harbor protections, the statements at issue are protected

by the judicially created "bespeaks caution doctrine." *Edward J. Goodman Life Income Trust*

*v. Jabil Circuit, Inc.*, 594 F.3d 783, 796 (11th Cir. 2010) (noting that the Eleventh Circuit's

"judicially created bespeaks caution doctrine" is the "statutory equivalent" of the "PSLRA safe

14

harbor provision"). "Under the bespeaks caution doctrine, a forward-looking statement is rendered immaterial as a matter of law when accompanied by meaningful cautionary language." *Id.* The state of mind of the speaker is irrelevant. *Id.*

Both the safe harbor and the bespeaks caution doctrine bar Plaintiff's claims arising from these statements because they either explicitly speak to future events or state opinions that can be evaluated only after consideration of future events. *See, e.g., Harris v. Ivax Corporation*, 182 F.3d 799, 805 (11th Cir. 1999) (affirming holding that statements "our fundamental business and . . . strategies remain intact" and are "very well positioned" were forward-looking with accompanying adequate cautionary language, within the safe harbor); *Edward J. Goodman Life Income Trust*, 594 F.3d at 796 (affirming dismissal of shareholders' fraud claims stemming from earning projections because of the safe harbor provision).

Attempting to specify the statements "alleged to have been misleading" from the June 2017 Statements, Plaintiff quotes from the August 31 Press Release and August 31 Earnings Call. Am. Cplt., ¶¶ 43-53 (alleging failure to disclose execution issues, different hedging policies, exposure to currency fluctuations, difficulties managing legacy Technology Solutions vendors, the importance of rebates, and the competitive European market). Yet, Tech Data specifically cautioned the investing public, including Plaintiff, about these risks. *See, e.g.*, Section II.B.*, supra* (discussing certain Risk Factors). "[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris*, 182 F.3d at 807. Because Plaintiff relies on forward-looking statements accompanied by meaningful disclosures barred by the PSLRA's safe-harbor and

the bespeaks caution doctrine, the Amended Complaint should be dismissed; this time, with prejudice.

### 2.   The Company's Public Disclosures Are Fatal To Plaintiff's Claims.

Tech Data's ample risk disclosures in its public SEC filings nullify Plaintiff's allegations of "materially false and misleading statements, and/or omitted material facts." Am. Cplt. ¶ 43; *see, e.g.*, *Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 400 (D. Del. 2016) ("If alleged omissions 'are contradicted by the company's public disclosures … there can be no Section 10(b) claim.'") (quoting *Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013)); *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed.").

Plaintiff challenges statements regarding the Company's "execution capabilities," its "optimization of relationships" with TS vendors, the "exceedingly competitive market environment in Europe," and the "Company's expected earnings for 2Q18." Am. Cplt. ¶ 43. But the Company published cautionary statements and detailed disclosures relating to the statements challenged in the Complaint. *See* Section II. D., *supra*. In fact, in specifically cautioning readers about the Company's forward-looking statements regarding its future earnings, the Company's June 1 Press Release stated:

> *any statements that refer to projections of Tech Data's or Technology Solutions' future financial performance … are forward looking statements. These forward looking statements are only predictions and are subject to risks, uncertainties, and assumptions. Therefore, actual results may differ materially and adversely from those expressed in any forward looking statements.*"

45060264;1

Ex. 4 (italics in original). The Company also directed the investing public to its most recent Form 10K filing for additional information about the specific risk it faced. *Id.*

The Risk Factors disclosed in Tech Data's Annual Report on Form 10-K disclosed the very information that Plaintiff alleges was omitted, defeating its claims. *See* Ex. 3, p. 11-13 (listing several "Risk Factors"). Among other risks, Tech Data explained that its ability to earn a profit may be affected by "changes in vendor terms and conditions, such as rebates, …"; that it might "encounter difficulties in fully integrating TS into our business …"; and that "TS may underperform relative to our expectations." *Id.* These Risk Factors directly and explicitly disclosed the risk for potential rebate performance and integration issues, which were later associated with the financial results reported in the August 31 Press Release. *Id.* Because these risks were disclosed, Plaintiff cannot use these same risks as the basis for omission claims. *See, e.g.*, *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d at 155.

A review of analyst reports from non-party outside sources also reflects that these risks were disclosed and appreciated by the markets both after the acquisition in March 2017 and after the alleged start of the putative class period in June 2017. *See, e.g.*, **Exhibits 16-28**.[3] For instance, after the acquisition, analysts from Bank of America Merrill Lynch reiterated a Buy rating on March 9, 2017, while disclosing several risk factors:

> Downside risks to our [Price Objective] are: (1) a lower-than-expected reacceleration of the IT/PC spending cycle, which would slow organic growth and mitigate expected margin benefits from volume leverage, (2) **inability to take share from competitors**, as in the past, and thus limit outperformance to the IT/PC markets, (3) inability to realize expected cost savings from restructuring, (4)

---

[3] "Among the public documents a court may consider in a motion to dismiss securities fraud claims are analyst reports when they are submitted to establish 'whether and when certain information was provided to the market,' not the truth of the matters asserted in the reports." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D. Cal. 2008) (quoting *In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 987 n.1 (D. Ariz. 1999)).

slowdown and/or **miss-execution in either the higher margin, or higher growth businesses like Data-Center, or Mobility**, and (5) inability to integrate Avnet data center deal.

Ex. 16, p. 4 (emphasis added). The analysts expected margin improvement, while citing the "vendor rebate benefits as more variable." *Id.*, p. 1.

Additionally, the disclosed risks associated with currency fluctuations were recognized and documented by outside analysts. *See, e.g.*, Ex. 17, p. 13 (Raymond James report dated March 8, 2017, recognizing "exposure to fluctuations in foreign currency exchange rates" as a company specific risk because "over 60% of Tech Data's sales come from Europe."); Ex. 18, p. 6 (Needham report dated March 9, 2017 noting company specific risk from "currency fluctuations"). Outside analysts also clearly recognized and understood the disclosed risk associated with competition and weakening demand, especially in Europe. *See, e.g.*, Ex. 19, p. 3 (Citi report dated March 9, 2017 noting weakness in European demand and operating margin decline); Ex. 20, p. 3 (Stiefel report dated March 8, 2017 noting that there are "always risks that a target price for any security will not be realized" and specifically citing risk of "renewed pricing war between TECD and its competitors if end demand fizzles."); Ex. 21, p. 3 (Northcoast report dated March 9, 2017 stating that its analysts "expect the pressure seen in T.S.' server and storage business to continue for the foreseeable future."). Finally, these analyst reports establish that the market was aware that a significant portion of the Company's earnings sometimes came at the end of a reporting period. *See, e.g.*, Ex. 22, p. 2 (Cross Research report dated March 9, 2017 stating "management expects earnings to be back-end loaded due to typical seasonality and flow through from cost cutting").

45060264;1

After the June 2017 Statements, the market continued to understand the disclosed risks faced by the Company. For instance, analysts from Bank of America Merrill Lynch reiterated a Buy rating for Tech Data on June 1, 2017, noting similar risk factors to its prior report, including "inability to take share from competitors" and "miss-execution in either the higher margin, or higher growth businesses like Data-Center, or Mobility." Ex. 23, p. 4. And, analysts from Cross Research Group LLC reiterated a Hold rating on June 2, 2017. *See* Ex. 24, p. 1 ("We think Tech Data is positioning itself well for future growth … . However, **given continued integration risk** and more modest earnings guidance than expected (**even with the accelerated integration**), we reiterate our Hold rating.") (emphasis added). Similarly, Northcoast Research Partners, LLC reiterated a Neutral rating on Tech Data shares on June 5, 2017. *See* Ex. 25, p. 1 ("Although we are positive on shares of Tech Data following its strong 1Q18, **we suggest investors sit on the sidelines in the near-term to get a better understanding of the combined company's earning power**. We reiterate our NEUTRAL rating on shares of Tech Data at this time.") (emphasis added). Finally, analysts from Citi Research, did upgrade their recommendation from Sell to Neutral on June 1, 2017, but acknowledged downside risk factors. *See* Ex. 26, p. 13.

Tech Data's acquisition of TS was clearly recognized as a "major integration" that would require significant work, which logically entailed a level of risk and uncertainty. *See also* Ex. 27, Raymond James Analyst Report dated June 1, 2017, p. 11 ("Tech Data acquired Avent's Technology Solutions business for $2.6 billion … This will require a significant integration, including IT systems and rationalization of employee functions which may present risk of customer and/or vendor attrition."); Ex. 28, Stiefel Nicolaus & Company Analyst

Report dated June 1, 2017, p. 4 ("Risks to our target price include … risks associated with M&A integration.")

These outside analyst reports reflect that the market assimilated and understood Tech Data's cautionary disclosures. *See* Exs. 16-28. Thus, Plaintiff cannot plausibly allege that Defendants failed to disclose these risks prior to the start of the class period.

### 3.      The June 2017 Statements Are Accurate.

Plaintiff's claims also fail because it fails to allege a single fact to support its assertion that any of the June 2017 Statements were false when made. *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1346 ("The Eleventh Circuit requires Plaintiff to isolate each statement alleged to be false and explain why it is false."). Instead, Plaintiff relies entirely on the hindsight that the Company did not achieve that guidance. *Id.* at ¶ 75. This is not sufficient. *See Winn-Dixi*e, 531 F. Supp. 2d at 1346.

### 4.      The Amended Complaint Fails To Specifically Allege Why Any Actionable Statement Is Misleading.

Plaintiff fails to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" with the particularly required by PSLRA and Rule 9(b). *See* 15 U.S.C. § 78u-4(b)(1); *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 855 (11th Cir. 2016) ("if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."). Here, Plaintiff does not allege <u>any</u> facts to support its belief that the June 2017 Statements were false or misleading.

The Amended Complaint discusses the strong performance the Company experienced in 1Q18 and focuses on forward-looking statements regarding earnings and performance

anticipated for 2Q18. Am. Cplt. ¶ 62-74. Then Plaintiff alleges, with nothing short than pure hindsight, that the earnings guidance was misleading because the Company failed to disclose "execution issues," differences in how TS and the Company "bought, sold, and priced components," differences in hedging for "foreign currency exchange fluctuations," potential changes or failure to obtain "margin-rich rebates" from vendors, and "an intensely competitive market in the European region." *Id*., ¶ 75. As a result, Plaintiff claims that "Defendants had no reasonable basis to expect, and did not in fact expect, that Tech Data could achieve 2Q18 EPS in the range of $1.95 to $2.08." *Id*. Yet, these allegations come directly from statements made in August 2017, and Plaintiff fails to allege any facts that even suggest that such issues had occurred or were known when the June 2017 Statements were made.

For example, discussing the vendor-rebate issue, Plaintiff alleges:

> Although Defendants told investors that following the acquisition, Tech Data was "<u>optimizing</u>" its vendor relationships to ensure the Company had a "<u>strong coverage model with the right skill sets deployed</u>," in truth, the legacy Technology Solutions data center vendors were not vendors that Tech Data "**had a long history of managing at the volume and scale and scope**" that the Company had to manage post-acquisition, nor did Tech Data have deep relationships or "**deep amount of skills**" with those vendors.

Am. Cplt. ¶ 49 (bold and underlined emphasis added). The language in bold[4] quotes statements made during the August 31 Earnings Call. *See* Ex. 6, p. 10. Plaintiff's hindsight-based claims should be dismissed. *See Sierra Wireless*, 482 F. Supp. 2d, 365, 373 (S.D.N.Y. 2007) ("misguided optimism is not a cause of action, and does not support an inference of fraud.") The Amended Complaint must be dismissed because it fails to specifically include any facts

---

[4] Also, the underlined quotes from the June 2017 Earnings Call cannot be challenged because they are vague statements of corporate optimism. *See* Section III.B.5, *infra*.

alleging a reasonable belief that the issues existed and were known at the time the June 2017 statements were made.

### 5. Plaintiff Cannot Rely Upon Corporate Optimism.

In support of both claims, Plaintiff quotes many non-actionable statements in the Amended Complaint, which are considered "corporate optimism" or "non-actionable immaterial puffery." *See e.g.,* Am. Cplt., ¶¶ 44, 58, 65 (quoting statements that company was "executing extremely well"), ¶¶ 64, 66 (quoting statements regarding "excellent progress" integrating TS). These statements are not capable of objective verification, and thus, are "not actionable because reasonable investors do not rely on them in making investment decisions." *See In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1343-44 (M.D. Fla. 2007); *In re Royal Caribbean Cruises Ltd.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) ("A statement that is vague, generalized, or 'mere corporate puffery' is immaterial because a reasonable investor would not base a decision on such statements.")

In dismissing the *Winn-Dixie Stores, Inc. Securities Litigation*, this Court relied on a case from the Tenth Circuit, which specifically addressed a "CEO's statement that the company had experienced 'substantial success in the integration of the sales forces and operations' of the two companies, that the merger was moving 'faster than we thought it would' and that the merger presented a 'compelling set of opportunities' for the company." 531 F. Supp. 2d at 1344 (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997)). Both courts concluded that those were "the sort of soft puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism." *Id.*

Plaintiff relies on similar statements here. In Section "V. Defendants' False and Misleading Statements And Omissions During the Class Period," Plaintiff heavily quotes vague statements of corporate optimism, to allege that Defendants "painted an extremely rosy picture" in June 2017. Am. Cplt., ¶¶ 62-70. Even if false or misleading—a contention Defendants' deny and strongly dispute—statements of corporate optimism cannot support Plaintiffs' claims. *See In re Winn-Dixie Stores*, 531 F. Supp. 2d at 1344 ("General, non-specific statements of optimism or hope even if arguably misleading, do not give rise to a federal securities claim because they are not material.") (internal citation omitted); *Mogensen v. Body Central Corp.*, 15 F. Supp. 3d 1191, 1212-13 (M.D. Fla. 2014) ("Any claims based on these immaterial, puffing statements must, therefore, be dismissed.").

     **6.**     **The Amended Complaint Fails To Allege Facts Necessary To Plead A Strong Inference Of Scienter.**

Because the safe harbor applies, dismissal is required regardless of whether Plaintiff sufficiently alleges scienter. But independently, Plaintiff's claims must be dismissed because the Amended Complaint fails to plead facts sufficient to support *any* inference of scienter, let alone the strong inference requirement imposed by the PSLRA. To plead claims under § 10(b) and Rule 10b-5, Plaintiff must allege particularized allegations that each defendant intended to deceive, manipulate, or defraud, or that each acted with severe recklessness to satisfy the scienter requirement. *See Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010); *Bryant*, 187 F.3d at 1282. Allegations of "severe recklessness" are held to a very demanding standard:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the

45060264;1

> standards of ordinary care, and that present a danger of misleading
> buyers or sellers which is either known to the defendant or so
> obvious that the defendant must have been aware of it.

*Thompson*, 610 F.3d at 634 (quoting *Bryant*, 187 F.3d at 1282 n.18).

### a.     Fraud By Hindsight Is Not Enough To Plead Scienter.

Plaintiff merely alleges "fraud by hindsight"—focusing on the reasons provided in August 2017 for the financial expectations shortfall without any allegation of fact to suggest that Defendants had actual knowledge of the issues or their magnitude in June 2017. Am. Cplt., ¶¶ 89-91 (relying on statements made on October 10, 2017 and December 5, 2017, several months after the June 2017 Statements allegedly at issue). Plaintiff fails to allege facts sufficient to make the inference of scienter "more than merely plausible or reasonable." *Tellabs*, 511 U.S. at 314 (explaining that to survive dismissal, the complaint must allege facts sufficient to make the inference of scienter "at least as compelling as any opposing inference of non-fraudulent intent.").

Essentially, Plaintiff asks the Court to infer that: (i) information announced in August was available and known to the Defendants in June; and (ii) Defendants knowingly or with severe recklessness acted to conceal that information. Am. Cplt. ¶¶ 86-92. For these unwarranted inferences, the only factual allegation made is that the information, which related to the earnings per share for, and market and operational issues experienced during, the quarter ending July 31, 2017, was announced in August. *Id.* This is not sufficient. *See, e.g.*, *Durgin v. Mon*, 415 F. App'x 161, 166-67 (11th Cir. 2011) (concluding it was not "highly unreasonable" or an "extreme departure from the standards of ordinary care" to refer to loans as non-recourse even if the loans were not properly characterized as non-recourse); *Maguire Financial, L.P. v.*

*Powersecure International, Inc.,* 876 F.3d 541, 548 (4th Cir. 2017) ("Appellant's argument fuses an inference that [defendant] knew enough to realize that his characterization was technically incorrect with an inference that he intended it to deceive. Yet scienter and knowledge with respect to misrepresentation are distinct components of the requisite analytical framework.").

The Amended Complaint is fatally devoid of allegations providing the "who, what, where, and when" of the purported falsity of the June 2017 Statements. *See, e.g.*, *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1052 (11th Cir. 2015) (recognizing that Rule 9(b)'s heightened pleading requirements requires the plaintiff to allege particular facts about "the 'who,' 'what,' 'where,' 'when,' and 'how'" of the fraud). Plaintiff cannot allege facts to support its unwarranted inference of alleged knowledge because the financial expectations shortfall was simply not anticipated. *See* Ex. 7, p. 8. ("All of those issues are solvable. It's just that they impacted us in this quarter in a way that was much larger than we anticipated.").

Additionally, statements in the August 31 Earnings Call explain why Defendants could not have known this information at the time of the June 2017 Statements:

> **Jim Suva** - *Citigroup Inc., Research Division - Director*
> Can you bring us up to speed about kind of when all these misexecution, pricing and rebate issues started to occur? …
>
> **Robert M. Dutkowsky** - *Tech Data Corporation - Chairman & CEO*
> Yes, it's a good question, Jim. I think it -- **the profitability shows up towards the end of the quarter when rebate attainment comes up short.** …, we had strong sales performance in some lower profitability products and less sales performance in the higher profitability products, **but we still had our eyes on the rebate potential across all of those product categories. And then when we get to the end, we came up short on the rebates. So that was a big component,** big piece of the performance in the quarter on a profitability perspective.

45060264;1

*See* Exhibit 7, at 9 (emphasis added).

The quote establishes that Defendants did not know the amount of the rebates until the end of the quarter, despite strong sales numbers. *Id.* This cuts against Plaintiff's attempt to satisfy the heightened standard for scienter. *Durgin*, 415 F. App'x at 167 ("An inference of severe recklessness is *not* as compelling as an inference that, at worst, defendants acted with inexcusable negligence.") (emphasis in original).

     **b.**     **The 2017 Stock Sale Does Not Support A Scienter Inference.**

Plaintiff mischaracterizes Mr. Dutkowsky's stock sale history in a futile attempt to allege the necessary element of scienter, by comparing his June 22, 2017 sale of 20,000 shares with a partial March 11, 2016 sale of 1,200 shares. Am. Cplt. ¶ 93. But the publicly filed Form 4 establishes that Mr. Dutkowsky's March 11, 2016 sale totaled 14,000 shares -- not 1,200 shares. *See* Ex. 11. Also, prior Form 4s confirm that Mr. Dutkowsky's sale of 20,000 shares in 2017, like the 2016 sale, was not unusual in either scope or timing. *See* Ex. 8-10 (reflecting sales from 2013-2015 ranging from 10,000 to 40,000 shares); Section II.D., *supra*.

Mr. Dutkowsky's June 2017 stock sale was consistent with his prior trading history and was not suspiciously timed. As such, Plaintiff cannot rely on the stock sale to infer fraudulent intent. *See, e.g.*, *Mogensen*, 15 F. Supp. 3d at 1222 (concluding stock sales were not "suspicious" in terms of amount or timing, when compared with the defendants' prior trading histories); *Durham v. Whitney Information Network, Inc.*, No. 06-cv-687, 2009 WL 3783375, at *17 (M.D. Fla. Nov. 10, 2009) (rejecting attempt to use stock sale to infer scienter because plaintiff failed to allege sale history necessary to show unusual scope or timing of the sale). The Amended Complaint is also devoid of any allegations challenging any sale by the other

individual defendant, Mr. Dannewitz, which further undercuts Plaintiff's mischaracterizations of a conspiracy to profit through misrepresentation or non-disclosure. *See Durham*, 2009 WL 3783375, at *17, n.8 (noting that plaintiff identified only 3 of 6 individual defendants as selling their stock during the class period, undermining any showing of fraudulent intent).

> ### 7. Plaintiff's Failure To Adequately Plead Count I Is Fatal To Plaintiff's Dependent Section 20(a) Claims In Count II.

This Court must dismiss Plaintiff's Section 20(a) claims in Count II of the Amended Complaint, because Section 20(a) claims cannot stand where Plaintiff has failed to adequately plead a primary violation of Section 10(b). *Kinnett v. Strayer Educ., Inc.*, 501 F. App'x 890, 894 (11th Cir. 2012) ("Because a primary violation of the securities laws constitutes an essential element of a § 20(a) derivative claim, a plaintiff adequately pleads a § 20(a) claim only where the plaintiff adequately pleads a primary violation.") (citing *Mizzaro*, 544 F.3d at 1237). Thus, Plaintiff's failure to adequately plead a primary claim for violation of Section 10(b) in Count I, for the reasons detailed above, is also fatal to Plaintiff's attempt to plead the dependent Section 20(a) claims in Count II. *Id.* Accordingly, both counts should be dismissed with prejudice.

## CONCLUSION

Defendants respectfully request that the Court enter an Order: (a) dismissing the Amended Complaint in its entirety, this time with prejudice; (b) awarding Defendants the costs and disbursements of this action, including attorneys' fees pursuant to 15 U.S.C. § 78u-4(c); and (c) awarding Defendants such other and further relief as the Court deems just and proper.

45060264;1

## LOCAL RULE 3.1(j) REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.1(j), Defendants request oral argument on this motion and estimates the time required for both sides to make their presentation to be one hour.

Dated: April 27, 2018.            Respectfully submitted,

**AKERMAN LLP**

*/s/ Irene A. Bassel Frick*
Brian P. Miller, Esq.
Florida Bar No. 0980633
**TRIAL COUNSEL**
Primary Email: Brian.Miller@akerman.com
Samantha J. Kavanaugh
Florida Bar No. 0194662
Primary Email: samantha.kavanaugh@akerman.com
Three Brickell City Centre
98 SE 7th Street, Suite 1100
Miami, FL 33130
Phone: 305.374.5600
Fax: 305.374.5095

*And*

Irene A. Bassel Frick, Esq.
Florida Bar Number: 0158739
Primary Email: Irene.Frick@akerman.com
Jason L. Margolin, Esq.
Florida Bar Number: 69881
Primary Email: jason.margolin@akerman.com
401 E. Jackson St., Suite 1700
Tampa, FL 33602
Phone: 813.223.7333
Fax: 813.223.2837
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 27, 2018, I filed the foregoing with the Court via CM/ECF, which will serve a true and correct copy via email service on all counsel of record.

*/s/ Irene A. Bassel Frick*
Attorney

45060264;1