UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NEALAN BHATT, Individually
and on Behalf of All Others Similar
Situated,

  Plaintiff,
v.

Case No. 8:17-cv-02185-T-02AEP

TECH DATA CORPORATION,
ROBERT M. DUTKOWSKY, and
CHARLES V. DANNEWITZ,

  Defendants.
_____/

## ORDER

This matter comes to the Court on Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint. Dkt. 47. Lead Plaintiff Wayne County Employees' Retirement System ("Plaintiff") filed its Opposition to Defendants' Motion to Dismiss Amended Class Action Complaint. Dkt. 54. Defendants filed a Reply Brief in Support of Motion to Dismiss Amended Class Action Complaint. Dkt. 58. The Court heard argument on October 19, 2018. Dkt. 66. In accord with its order on October 23, 2018, the Court **GRANTS** Defendants' motion. The case is **DISMISSED WITH PREJUDICE.**

## BACKGROUND

Plaintiff's Amended Class Action Complaint (the "Complaint") asserts a securities fraud class action on behalf of all purchasers of the common stock of Defendant Tech Data Corporation ("Tech Data") between June 1, 2017 and August 31, 2017, inclusive. Dkt. 44 ¶ 1. Tech Data is a wholesale distributor of technology products. *Id.* ¶ 2. Tech Data's stock is listed and trades on the NASDAQ under the ticker symbol "TECD." *Id.* ¶ 18.

On February 27, 2017, Tech Data announced it had completed its acquisition of another technology distribution business, Technology Solutions ("TS"), and highlighted the benefits the acquisition was anticipated to provide. *Id.* ¶ 3. On March 8, 2017, Tech Data reported its financial results for its fourth quarter and fiscal year ending January 31, 2017. *Id.* ¶ 4. Because the TS acquisition had closed just ten days prior, Defendants declined to give guidance for the next quarter, the first quarter of its fiscal year 2018 ("1Q18"). *Id.* Defendants stated they would be prepared to resume providing guidance when they reported the 1Q18 results. *Id.*

On June 1, 2017, Tech Data announced its 1Q18 results and provided guidance for the next quarter ("2Q18") through a press release and an earnings conference call. *Id.* ¶ 5. Defendants "emphasized the Company's strong

2

execution capabilities," stated that the combined Tech Data-TS business was "executing extremely well," and highlighted Tech Data's "optimization" of its vendor relationships. *Id.* Defendants provided second quarter guidance anticipating worldwide net sales from $8.55 billion to $8.80 billion and non-GAAP earnings per share ("EPS") from $1.95 to $2.08. *Id.* ¶¶ 5, 43.

On August 31, 2017, after the markets closed, Tech Data announced its 2Q18 results. *Id.* ¶ 56. Although Tech Data's net sales of $8.9 billion were above guidance, Tech Data reported non-GAAP EPS of $1.74. *Id.* The next day, Tech Data's stock price fell over 21% from a closing price of $110.29 on August 31, 2017 to $87.46 on September 1, 2017. *Id.* ¶ 59.

Plaintiff claims the June 1, 2017 statements were materially false, misleading, and omitting material facts. *Id.* ¶ 6. Specifically, Plaintiff alleges that "Defendants made materially false and misleading statements and/or omitted material facts concerning: (a) the combined Tech Data-TS' execution capabilities; (b) the Company's optimization of relationships with legacy TS vendors; (c) the exceedingly competitive market environment in Europe; and (d) the Company's expected earnings for 2Q18." *Id.* ¶ 43. The first count of the Complaint is for Violation of § 10(b) of the Securities Exchange Act and Rule 10b-5. *Id.* ¶¶ 113-16. Count II is for Violation of § 20(a) of the Securities

Exchange Act. *Id.* ¶ 118. Defendants moved to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). When considering the motion, the court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. *Id.* at 696. But "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir. 2002).

The court "must consider the complaint in its entirety, as well as . . . matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). In a securities fraud case, the court may consider securities filings alleged to contain misstatements. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir. 1999). A court may also look to documents incorporated by reference into the complaint if they are

4

central to the plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citation omitted).[1]

## DISCUSSION

To establish a claim under § 10(b), a plaintiff must demonstrate "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236-37 (11th Cir. 2008) (citation omitted); *see also* 17 C.F.R. § 240.10b-5.

A claim under § 20(a) against a "controlling person" requires that an entity violated the securities laws and that the defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities law . . . [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which results in the primary liability." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396-97 (11th Cir. 1996) (alterations in original) (citation omitted). Absence of an adequately

---

[1] In its Opposition, Plaintiff argues that the Court should not consider the non-party analyst reports provided by Defendants because they were not relied upon in the Complaint and are not central to Plaintiff's claims. Dkt. 54 at 18; Dkt. 47, Ex. 16-28. The Court finds these reports are unnecessary to resolve the motion, and they were not considered.

5

pleaded primarily violation, in this case § 10(b) and Rule 10b-5, is fatal to a § 20(a) claim. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006).

The Court finds that Plaintiff failed to plead a violation of § 10(b). Thus, the § 20(a) claim also fails. Because any amendment to the Complaint would be futile, leave for Plaintiff to amend is unwarranted.

I. <u>Plaintiff failed to plead a violation of § 10(b).</u>

Under the heightened pleading standards of the PSLRA, the plaintiff must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed," and (2) "with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u-4(b)(1)-(2). Here, Plaintiff is unable to establish that Defendants made a misrepresentation or omission of material fact, or that any

misrepresentation or omission was made with the necessary mental state.

a. *Misrepresentation or omission*

To begin with, Defendants' statements fall squarely within the PSLRA's safe harbor, which immunizes "forward-looking statements" that prove to be false if accompanied by "meaningful cautionary language." *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999).[2] To be protected, the statements must qualify as "forward-looking" under 15 U.S.C. §§ 78u-5(i)(1)(A)-(F), and meet any of the conditions set forth in §§ 78u-5(c)(1)(A)-(B). The accompanying cautionary language, meanwhile, must identify factors that could cause actual results to materially differ from the statements. *Harris*, 182 F.3d at 803; 15 U.S.C. § 78u-5(c)(1)(A)(i).

In evaluating the statements at issue, *Carvelli v. Ocwen Financial Corp.*, No. 9:17-cv-80500-RLR, 2018 U.S. Dist. LEXIS 73597 (S.D. Fla. Apr. 30, 2018) is particularly instructive. There, the complaint alleged the defendant made materially false statements or omissions about its (1) failure to fix serious deficiencies in its mortgage servicing software platform; (2) "mortgage servicing misconduct [being] a thing of the past"; (3) noncompliance with prior

---

[2] Similarly, the Eleventh Circuit's "judicially created bespeaks caution doctrine" renders immaterial a forward-looking statement "accompanied by meaningful cautionary language." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 796 (11th Cir. 2010).

regulatory settlements and continued violations of federal and state law; (4) remediation costs that were higher than expected and its taking a reserve charge in connection with an enforcement action; and (5) problems with state regulators who had issued cease and desist orders to its subsidiaries. *Carvelli*, 2018 U.S. Dist. LEXIS 73597, at *3-7. The defendant's stock price had dropped nearly 80%. *Id.* at *7. Notwithstanding these allegations, the court went on to dismiss the § 10(b) and § 20(a) claims, finding that the challenged statements were non-actionable puffery and non-actionable forward-looking statements accompanied by cautionary language. *Id.* at *11-17.

The facts as presented here are not nearly as severe as those in *Carvelli*.[3] Plaintiff challenges Tech Data's financial guidance for 2Q18: "Tech Data anticipated worldwide net sales to be in the range of $8.55 billion to $8.80 billion and non-GAAP EPS in the range of $1.95 to $2.08." Dkt. 44 ¶¶ 63, 74. While it is true that Tech Data's non-GAAP EPS was only $1.74, *id.* ¶ 56, projections of revenue and earnings per share are specifically included within the definition of "forward-looking statements" protected by the PSLRA's safe harbor, 15 U.S.C. § 78u-5(i)(1)(A).

---

[3] Like the court in *Carvelli*, the Court does not walk through each statement in its order, though it has analyzed each alleged material misrepresentation or omission. To this end, at oral argument the Court heard from the parties on each challenged statement and omission.

Plaintiff also challenges statements about Tech Data's post-acquisition "outstanding execution capabilities," that the company was "executing extremely well," and that it was "optimizing vendor and customer relationships." Dkt. 44 ¶¶ 5, 33-34, 39-44, 64-68, 73-74. But statements about how Tech Data might execute over the next quarter and its ongoing efforts to optimize its vendor relationships are statements of "plans and objectives" and "future economic performance" that also fall within the definition of "forward-looking statements." *See* 15 U.S.C. § 78u-5(i)(1).

These statements were, moreover, identified as forward-looking statements and accompanied by meaningful cautionary language. First, both the press release and earnings call included extensive disclaimers about any forward-looking statements.[4] Dkt. 47-4 at 5; Dkt. 47-5 at 2. Second, the press release and earnings call directed investors to the risk factors outlined in the "Annual Report on Form 10-K for the year ended January 31, 2017, including Part I, Item 1A, 'Risk Factors' therein, Quarterly Reports on Form 10-Q,

---

[4] To the extent that the earnings call statements were oral, the Court finds that they were accompanied by "an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document," and that the oral statements referenced those relevant documents, namely the Annual Report and related filings with the Securities and Exchange Commission. 15 U.S.C. § 78u-5(c)(2); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 n.10 (3d Cir. 2010) (finding safe harbor applicable where "oral forward-looking statements were identified as such in contemporaneous oral statements that referred listeners to written cautionary language in [the] Form 10-Ks").

Current Reports on Form 8-K and other securities filings with the Securities and Exchange Commission." Dkt. 47-4 at 5; Dkt. 47-5 at 2. These risk factors, which would be important to a reasonable investor, disclosed that Tech Data might underperform and that its deals with its vendors were always subject to change. Dkt. 47-3 at 11-13.

In fact, the Annual Report included two risk factors that specifically concerned TS. The first addressed possible difficulties with the integration of TS into Tech Data's existing business. *Id.* at 13. The second noted, "TS may underperform relative to our expectations. Following the acquisition of TS, we may not be able to maintain the levels of revenue, earnings or operating efficiency that we and TS have achieved or might achieve separately. The business and financial performance of TS are subject to certain risks and uncertainties. We may be unable to achieve the same growth, revenues and profitability that TS has achieved in the past. Our failure to do so could have a material adverse effect on our financial condition and results of operations." *Id.* The Court finds this cautionary language amply meaningful.

Plaintiff also seems to take issue with Tech Data's 1Q18 10-Q, which discussed the company's "foreign currency risk management" objectives: "The Company considers inventory as an economic hedge against foreign currency

exposure in accounts payable in certain circumstances. This practice offsets such inventory against corresponding accounts payable denominated in currencies other than the functional currency of the subsidiary buying the inventory when determining the net exposure to be hedged using traditional forward contracts. Under this strategy, the Company would expect to increase or decrease selling prices for products purchased in foreign currencies based on fluctuations in foreign currency exchange rates affecting the underlying accounts payable." Dkt. 44 ¶ 72. The same document, however, also notes that it includes forward-looking statements that may differ materially from actual results and it directs investors to the risk factors in the Annual Report and other public filings.[5]

Plaintiff next argues that because the challenged statements were made one month into the quarter, they were statements of current or historical fact instead of forward-looking statements. *E.g.*, Dkt. 54 at 1, 5, 10. Yet Plaintiff does not cite any authority for the proposition that the PSLRA restricts its safe harbor protections to statements made at the very beginning of a quarter. Issues

---

[5] Though neither party has provided the 10-Q for the quarterly period ended on April 30, 2017 in its entirety, the Court takes judicial notice of the document as a filing with the Securities and Exchange Commission. As of December 11, 2018, it is available electronically at http://investor.techdata.com/node/22246/html. Forward-looking statements and risk factors are mentioned on page 21.

of integration and execution are certainly an ongoing endeavor, and Defendants had cautioned that the revenue from products Tech Data purchased from certain vendors was subject to change and that vendors held significant negotiating power over Tech Data. Dkt. 47-3 at 11-13. In fact, issues with the vendor rebate process were among the factors Defendants cited in the 2Q18 earnings call as the basis for Tech Data's underperformance. Dkt 47-7 at 9.

Additionally, many of the statements included in the earnings call, such "as part of our integration process we are optimizing our vendor and customer relationships to ensure we have a strong coverage model with the right skill sets employed," are mere immaterial puffery or corporate optimism. Dkt. 47-5 at 3; *See In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1343-44 (M.D. Fla. 2007); *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013) ("A statement that is vague, generalized, or 'mere corporate puffery' is immaterial because a reasonable investor would not base a decision on such statements."). At bottom, Plaintiff has not alleged with specificity any fact suggesting that Defendants had "actual knowledge" that any statement about how Tech Data would perform over the quarter was false when made. *See Harris,* 182 F.3d at 803; *cf. FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1293-94 (11th Cir.

2011); *Bellocco v. Curd*, No. 8:02-cv-1141-T-27TBM, 2005 WL 2675022, at *3 (M.D. Fla. Oct. 20, 2005) ("Defendants' alleged comment that it 'had achieved exceptional brightness levels with its high brightness red light emitting diode (HB-LED) products' was false, as Defendants allegedly knew they had problems developing high brightness red LEDs.").

As for any omissions, a defendant's duty to disclose arises where a defendant's failure to speak would render a prior statement misleading or deceptive or where the law imposes special obligations. *In re Winn-Dixie Stores*, 513 F. Supp. 2d at 1344-45 (citation omitted). Absent a duty to disclose in the law or based on a prior statement, there can be no actionable omission. *Id.*; *see also Oxford Asset Mgmt., Ltd.*, 297 F.3d at 1189 ("Only if the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout is it proper for the court to pronounce the omission immaterial as a matter of law.").

Plaintiff cannot premise its omission claims on risks that were disclosed. *See, e.g., In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("A plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed."). Plaintiff alleges that Defendants failed to disclose that the "[TS]

components business bought, sold, and priced components differently than did Tech Data and did not hedge for foreign currency fluctuations, while Tech Data did." Dkt. 44 ¶ 75(a). But Tech Data's 2017 Annual Report made a point to flag both fluctuations in currency exchange rates and Tech Data's hedging against related risk. Dkt. 47-3 at 12. The Annual Report also discussed possible issues with the performance of TS and the competitiveness of the market in which Tech Data operates. *Id.* at 11, 13; *see Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 400 (D. Del. 2016) (citation omitted) ("If alleged omissions 'are contradicted by the company's public disclosures . . . there can be no Section 10(b) claim.'").

b. *Scienter*

Plaintiff also fails to state with particularity facts giving rise to a strong inference that Defendants acted with the requisite state of mind. To satisfy the scienter requirement, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which can be an "intent to deceive, manipulate, or defraud or severe recklessness." *Durgin v. Mon*, 415 F. App'x 161, 164, 166 (11th Cir. 2011) (citations and emphasis omitted); *see also Tellabs*, 551 U.S. at 314 (requiring "an inference of scienter" that is "more than merely plausible or reasonable—it

14

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent"). Severe recklessness is limited to "*highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care." *Durgin*, 415 F. App'x at 164, 166 (quotation omitted) (emphasis added in *Durgin*).

Plaintiff argues that, when considered collectively, a strong inference of scienter arises from allegations of different foreign exchange hedging policies between Tech Data and TS, that Tech Data hired many TS key employees who would have been aware of the currency risk and the competitive European market, and that Tech Data employed a "state-of-the-art information technology system" to access "a wealth of information regarding Tech Data's operations, sales, and product trends." Dkt. 44 ¶¶ 86-91. Related, Plaintiff also finds it probative that Tech Data would have been aware of the actual market results in time for the 2Q18 guidance. *Id.* ¶ 92.

Plaintiff additionally points to a sale of Tech Data stock by Defendant Dutkowsky shortly after the alleged misstatements. *Id.* ¶ 93. While an unusual stock sale is certainly relevant to scienter—and its absence "weighs against inferring scienter," *Mizzaro*, 544 F.3d at 1253—there was nothing out of the

ordinary with Defendant Dutkowsky's actions. Plaintiff directed the Court to a single stock sale by Defendant Dutkowsky in June 2017 and compared it to a relatively small sale in 2016. Dkt. 44 ¶ 93. Plaintiff admits, however, that it inadvertently neglected to include a much larger sale on that same 2016 date and Defendant Dutkowsky's prior five-year history, both of which indicate the routine nature of the 2017 stock sale. Dkt. 47 at 11; Dkt. 54 at 24. Despite the June 2017 sale, Defendant Dutkowsky's ownership interest in Tech Data remained higher after that sale than after other, prior sales due to interim stock awards by the company. Dkt. 47 at 11.

In the absence of a suspicious stock sale, the remainder of the Complaint's factual allegations, even pooled together, are insufficient to satisfy the scienter element. That Tech Data might have employed sophisticated financial reporting systems and hired key employees with historical knowledge simply does not give rise to a strong inference that Defendants acted with an intent to deceive, manipulate, or defraud, or severe recklessness. *See Durgin*, 415 F. App'x at 164-65.[6]

Similarly, the allegations that the financial predictions were made one

---

[6] One allegation concerned Defendant Dutkowsky's statements at the Robert W. Baird Global Consumer, Technology and Services Conference on June 8, 2017. Dkt. 44 ¶¶ 73-74. The statements appear to be a short excerpt from a transcript of Defendant Dutkowsky's comments. The full text of

month into the quarter also fail to give rise to the necessary inference. Instead, Defendants have offered a compelling inference of non-fraudulent intent: earnings per share were less than anticipated because, *inter alia*, "profitability shows up towards the end of the quarter when rebate attainment comes up short." Dkt. 47 at 25. At most, Plaintiff complains of fraud by hindsight, *In re Winn-Dixie Stores*, 531 F. Supp. 2d at 1350, unactionable because, as discussed above, there are no particularized allegations that Defendants knew the statements were untrue at the time they were made.

II. <u>Plaintiff fails to plead a violation of § 20(a).</u>

Section 20(a) claims cannot stand where a claimant fails to adequately plead a primary violation of securities law. *Garfield*, 466 F.3d at 1261. Thus, because the Court has dismissed Plaintiff's § 10(b) claim in Count I, it must also dismiss the § 20(a) claim in Count II. *Id.*

III. <u>Granting leave to amend the Complaint is inappropriate.</u>

In a one-sentence footnote, Plaintiff lastly requests leave to "amend the Complaint to address any perceived inadequacies." Dkt. 54 at 25 n.19. The

---

his comments was not presented. The Court advised the parties they could supplement the record in that regard if they wished. No supplementation occurred.

17

original complaint faced a substantially similar motion to dismiss prior to appointment of present lead counsel. Dkt. 21.

The Court finds that any further amendment of Plaintiff's Amended Complaint would be futile. *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). Plaintiff put forth no possible avenue for meaningful amendment in either its papers or at the oral hearing. Indeed, the Complaint is deficient not because of a technical matter, but because its allegations are simply not enough to meet the PSLRA's pleading requirements.[7] *See Harris*, 182 F.3d at 807-08 (affirming denial of leave to amend where proposed amended complaint's only "significant addition[]" was an allegation still protected by the safe harbor). There is no indication before the Court that another bite at pleadings would remedy this, especially considering that no new, actionable allegations have emerged during the relatively long lifespan of the case.

---

[7] This case is unlike *Bryant* because the Court has made no suggestion that the allegations in either complaint were ever sufficient to withstand a motion to dismiss. *See id.*

## CONCLUSION

The Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's Amended Class Action Complaint. Dkt. 47. The case is hereby **DISMISSED WITH PREJUDICE**. The Clerk is directed to enter judgment and close the case.

**DONE AND ORDERED** in at Tampa, Florida, on December 11, 2018.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
All counsel of record